# MERS: The Unreported Effects of Lost Chain of Title on Real Property Owners

## WHITE PAPER

June 2011

v. 3



**HARBINGER ANALYTICS GROUP**

WWW.HARBINGERAG.COM

# FORWARD

It has been widely reported that MERS[1] has broken or severely diluted[2] the chain of title for real property records, but what does this mean? To understand the importance of the chain of title to a property and the complexities of land boundaries we need to look no further than the advice given to practicing attorneys.

"To properly evaluate a case, counsel and survey experts often must examine chains of title for all properties subject to the dispute.  In the case of a boundary dispute, it may be necessary to search the chain of title back to a patent to determine paramount title or to locate true boundaries."[3]

As is readily apparent, a broken chain of title will have adverse effects on adjoining properties and in many instances the boundaries of properties within an entire neighborhood. Attorneys are advised to "*seriously consider not taking the case or withdrawing from it*."  If attorneys are advised to "seriously consider" withdrawing, how will the common victim of MERS (by proxy) get relief?

The complexity of the problem is obvious. As lenders and title insurers pass responsibility back and forth, property owners who purchased a foreclosed property that had been in the MERS system (and now have broken chains of title) and their neighbors will be forced into expensive and complex litigation in order to determine their boundaries.

Who will be financially responsible for the litigation to quiet title? This White Paper documents the importance of a chain of title and the far reaching effects of a lost chain of title.

---

[1] When referencing MERS in this report, the author refers to MERSCORP, Inc. and its 5000 plus members and the Mortgage Electronic Registration Systems, Inc. (a subsidiary of MERSCORP, Inc.).

[2] The terms broken and diluted are used interchangeably in this White Paper.  Chains of title are "diluted" when the historical indexing systems and proper public recordings are not utilized (along with back dating and forging of legal documents , ie. robo-signing) making a chain of title impractical to recreate.

[3] Continuing Education of the Bar (CEB), *California Easements and Boundaries, Law and Litigation* (July 2010) §§ 10,11, 10.32, pgs. 471-472, 489-490.  According to the Checklist: Dos and Don'ts in Boundary Location Dispute contained in this treatise, attorneys are advised to:
  - ➢ Remind clients that boundary location disputes are usually expensive to litigate (a client will sometimes fight to the last dollar).
  - ➢ Do not enter an appearance in any boundary litigation unless counsel is confident about handling both the emotional and legal issues.
  - ➢ If there is continued doubt about the boundary location, research, read, and review again; usually the answer is buried somewhere [in the chain of title].
  - ➢ If enormous doubt persists on location or validity of the boundary, seriously consider not taking the case or withdrawing from it.

See Exhibit G for a complete list.

# ABOUT THE AUTHORS

David E. Woolley is the author of this white paper.  Mr. Woolley is a California Licensed Land Surveyor and Certified Fraud Examiner with over 24 years of experience and is the principal in Harbinger Analytics Group.  Mr. Woolley's firms specialize in investigation of commercial real property boundary disputes, land survey fraud, land title insurance fraud and their cumulative effects on mortgage loans. Harbinger Analytics provides land title survey auditing and quality control programming, fraud investigation and technical report production pertaining to land survey and land title fraud.  Harbinger Analytics Group also provides litigation support services in the form of expert witness opinions regarding standard of care, professional negligence, negligent misrepresentation and breach of representations and warranties.  A copy of Mr. Woolley's curriculum vitae is attached to this report as **Exhibit I**.

Lisa D. Herzog is the editor and legal research analyst for this white paper.  Ms. Herzog is a California Licensed Attorney with over 14 years of professional legal experience in the fields of business litigation, employment litigation, discrimination litigation and business transactions and agreements.  Prior to attending law school, Ms. Herzog worked in the fields of human resources and labor relations management for several multinational corporations.  Additionally, Ms. Herzog is an adjunct professor for Pepperdine University Graziadio School of Business and Management in Malibu, California.  Ms. Herzog is also a writer, editor and consultant for Harbinger Analytics Group.

# DISCLAIMER

The information contained in this document is the proprietary and exclusive property of Harbinger Analytics Group (except as otherwise indicated).

The information contained in this document is subject to change without notice.

This information in this document is provided for informational purposes only. Harbinger Analytics Group specifically disclaims all warranties, express or limited, including, but not limited, to the implied warranties of merchantability and fitness for particular purpose, except as provided for in a separate license agreement.

Nothing in this article may be construed as offering legal advice.  Legal information is not legal advice.  The article is for basic informational purposes only and does not contain legal advice or legal opinions by the authors.  Any substantive legal questions should always be addressed to competent licensed legal counsel.  As such, Mr. Woolley and Ms. Herzog, are not, and cannot, be liable for offering any legal advice or opinions in this informational article. Additionally, the authors' use of the word "fraud" is meant in its everyday use. It is understood that the legal cause of actions encompassing fraud must be proven by specific elements in a court of law (including a determination of intent).

# Table of Contents

I.      Executive Summary

II.     Robo-Signer Mortgage Fraud

III.    The MERS System
        A.      What is MERS?
        B.      MERS Connection To Sub-Prime Loans and Securitization
        C.      What Is Wrong With MERS?
        D.      Recent Court Rulings Regarding MERS and Securitization
                1.      *U.S. Bank National Association v. Ibanez*
                2.      *In re Agard*
                3.      *In re Salazar*

IV.     Land Division and Chain Of Title In The United States
        A.      A Brief History Lesson
        B.      The Surveyor's Role – Determining Senior and Junior Property Rights In
                Sequential Property Conveyances
                1.      Diagram A

V.      How MERS Has Broken Or Diluted Chain Of Title For Boundary Disputes
        Between Foreclosed Properties and All Of Their Neighbors
        A.      Diagram B
        B.      A Purchaser's Inability To Obtain Title Insurance On A Foreclosed
                Property Processed Through MERS
        C.      The Torrens System – An Alternative
        D.      The Proposed National System – A Bad Idea

VI.     Conclusion

VII.    Exhibits
        A.      Case Description – Real Example of a Lost Chain of Title
        B.      California Statutes – Land Grants & Contract Law
        C.      Fidelity National Title – Boiler Plate Policy Language
        D.      Marketable Title – Basis of Claims
        E.      Diagram – Demonstrating Properties Affected by a Single Lost Chain of
                Title
        F.      Land Surveyor Examination Problem
        G.      Attorney's Checklist – Continuing Education for the Bar
        H.      Definition of Sequential and Simulations Conveyances
        I.      Curriculum Vitae for David E. Woolley
        J.      Definitions
        K.      Indemnity Language From Sample Deed

VIII.   MERS: The Effects of Lost Chain of Title on Real Property Owners
        Addendum 01 – Questions and Answers

I

## EXECUTIVE SUMMARY

Thanks to the Mortgage Electronic Registry System's ("MERS") failure to accurately complete and/or publically record property conveyances in the frenzy of banks securitizing home loans and in subsequent foreclosure actions,[1] neighbors to a foreclosed property (with a sequential conveyance) as well as the foreclosed property itself will have unclear boundaries and clouded/unmarketable titles making it difficult, if not impossible, for these homeowners to sell their properties and for subsequent purchasers to obtain title insurance on that property.[2]  MERS now keeps electronic records on about half of the home mortgages in the United States.[3]

Many problems with MERS and the home loan securitization process have been reported in print media (countless articles), in movies (the Inside Job) and on television (most recently on the April 3, 2011 edition of 60 Minutes).  Academic professors such as Christopher L. Peterson of the University of Utah, S.J. Quincy College of Law, have written extensively on what is wrong with MERS.[4]  Courts have ruled against MERS' standing to foreclose and have criticized the MERS model as being flawed, wholly inaccurate and not allowing homeowners to fight foreclosures because it shields the true owner of a mortgage in public records.[5]  States Attorneys' General and federal bank regulators[6] are investigating MERS practices including fraudulently robo-signing and back dating missing documents.  A few County Registrars of Deeds are claiming that they are owed millions of dollars in lost revenue from mortgage assignment

---

[1] "For banks, the local government recorders weren't speedy enough especially as the mortgage industry moved into the business of securitization, or bundling and selling mortgages." Marian Wang, *Backgrounder: A Closer Look at MERS, the Industry's Controversial Mortgage Clearinghouse*, ProPublica (March 7, 2011).

[2] As a preliminary matter, an understanding of the terms attached hereto in Exhibit J are essential understanding this White Paper.

[3] Marian Wang, *Backgrounder: A Closer Look at MERS, the Industry's Controversial Mortgage Clearinghouse*, ProPublica (March 7, 2011).

[4] See Christopher L. Peterson, *Foreclosure, Subprime Mortgage Lending and the Mortgage Electronic Registration System*, University of Cincinnati Law Review (Summer 2010) Vol. 78, No. 4.  See also Written Testimony of Christopher L. Peterson, *Foreclosed Justice:  Cause and Effects of the Foreclosure Crisis*, United States House of Representatives Committee on the Judiciary (December 2, 2010).

[5] As an example, see *In re Agard* (United States Bankruptcy Court, Eastern District of New York, February 10, 2011) Case No. 8-10-77338, Doc. 41 where the court held that MERS lacked the legal standing to transfer the ownership of mortgages on behalf of banks.  In his opinion Judge Robert E. Grossman stated "This court does not accept the argument that because MERS may be involved with 50 percent of all residential mortgages in the country, that is reason enough for this court to turn a blind eye to the fact that this process does not comply with the law."

[6] Including the Office of the Comptroller of Currency, the Federal Reserve, the Federal Deposit Insurance Corporation and the Federal Housing Finance Agency. Marian Wang, *Backgrounder: A Closer Look at MERS, the Industry's Controversial Mortgage Clearinghouse*, ProPublica (March 7, 2011).  See also Nick Timiraos, *Critical Signs in Foreclosure Talks*, The Wall Street Journal (April 12, 2011) (giving status of settlement with states' attorneys' general and federal regulators and lenders).

transfers that were not recorded because MERS was listed as the mortgagee in public land records.[7]

What none of the "experts," reporters, or courts are analyzing (in specific terms) is the destructive effect that the MERS system will have on 400 years of recorded property rights in the United States. Most articles mention the lost chain of title but stop short of explaining what this means, or how it will affect people that may not have a mortgage, much less a mortgage in the MERS system. These problems deal with ramifications "on the ground" for determining (1) property boundaries (senior and junior property rights) and (2) proof of ownership in order to obtain title insurance. As shown below, these MERS created problems will affect both foreclosed properties and all of their neighboring properties amounting to much larger and more costly problems than have been previously addressed by the media, lawmakers, courts or any settlements with MERS.

Because MERS is utilized for transferring title and these transfers are not publicly recorded, MERS does not comply with race/notice[8] statutes and senior and junior property rights cannot be determined when there is a discrepancy in property boundaries. In fact, MERS has undone hundreds of years of recorded property rights leaving property owners to litigate their boundaries. This assertion sounds extreme; however, it is absolutely true. Consider these questions:

1. What happens if the chain of title cannot be determined because there are no accurate and publicly recorded deeds/title documents showing chain of title to determine senior and junior rights designations for boundary determinations between neighbors?

2. What happens when you destroy the property rights and records of homeowners who never defaulted on their mortgages and are now forced to litigate boundary disputes and property rights?

3. Why did the title insurance companies repeatedly refuse to underwrite foreclosures if land title was stable?

---

[7] See article by Austin Kilgore, *Recorder Wants to Close Account at Bank of America to Protest MERS*, National Mortgage News (April 11, 2011) Section: NEWS, pg. 8, Vol. 35, No. 28 regarding Registrar of Deeds in South Essex District of Massachusetts.

"MERS saved banks time and money by providing a private, electronic alternative to the public system used by local government recorders. By using the MERS registry, they largely avoided the recording fees." Marian Wang, *Backgrounder: A Closer Look at MERS, the Industry's Controversial Mortgage Clearinghouse*, ProPublica (March 7, 2011).

[8] For the purposes of this paper, we are not distinguishing the differences between race, notice and race/notice. Race/notice is meant to encompass all designations.

These are the exact problems that MERS has created – the bigger problems that no one has explained – the elephant in the room.  In a rush to buy and sell mortgages as quickly as possible, lenders have also destroyed and/or severely diluted over 400 years of land title records dating back to the colonial United States (back to 1850 in California).  This destruction/dilution means that litigation is the only way to resolve boundary disputes.  We will never be able to determine senior (superior) and junior (inferior) property rights designations because no one will know which parcels were conveyed first in time and to whom.  We are already seeing these problems with the MERS system dealing with widely publicized mortgage foreclosures and lenders' inability to show that they own title to property at the time of foreclosure.

The broken chain of title problem may have never been a problem if not for the millions of foreclosed properties.  Because mortgage lenders, via MERS, have not followed title statutes specific to their respective states, they have also negated the rights created by race/notice statutes.  Because these race/notice statutes were violated, a property owner (who may not even be in the MERS mortgage system) may have lost his property rights.  Stated another way, if the chain of title is lost for a given property, any property that shares a common property boundary line, may have lost its superior rights and that owner will be required to litigate if the property's boundary is questioned.  In essence, "Zombie Loans" are created by MERS.  These Zombie Loans never die (they keep coming back to life), they mutate and they multiply.

Furthermore, with clouded titles, subsequent purchasers of these properties will not be able to obtain title insurance without providing indemnification via a warranty deed or comparable document, and, without title insurance, these purchasers will not be able to obtain financing on the properties.

<u>Two Examples</u>

1.      A neighbor's property sale (with disclosure issues) created duress for an 83 year old widower trying to settle his estate.  There was confusion as to the property line location in the magnitude of 9' feet.  It also cost him approximately $10,000 (even at a discounted rate) and 18 months of time.  In this case, the chain of title was broken in 1968 in connection with (1) a foreclosure; (2) a subsequent bankruptcy; and (3) a transfer to a now defunct savings and loan. The title insurance company recognized the lost chain of title problem when it issued a title insurance policy and wrote an exception to coverage for that problem.[9]  The self-employed architect owner (neighbor) chose not to sue for title insurance coverage due to his costs in attorneys' fees in a downturned economy.  See <u>Exhibit A</u>, detailed description of this case.

---

[9] Title insurance companies only paid claims equivalent to 5% of premiums collected in loss and loss adjustments in 2005.  This 5% payout is contrasted to a 73% payout of premiums collected toward property/casualty claims during this same timeframe.  United States Government Accountability Office, GAO-07-401 (April 2007), pg. 9.

2.      A land surveyor, presumably trained in title work, chose not to examine a chain of title in the course of a survey. This litigation resulted in a 2010 settlement of approximately $500,000 (plus an additional several hundred thousand dollars in attorneys' fees) wherein Mr. Woolley served as an expert witness. This litigation resulted from not properly examining rights established by reviewing available chain of title documents. A broken chain of title removes the option of determining the rights and this case demonstrates costs and ramifications.

The MERS system has created an environment in which tens of thousands of titles have been lost or diluted in a sea of other MERS transactions and may take a hundred years to fix, while forcing innocent homeowners to litigate in order to reclaim their property rights.    This article will:

1.      Briefly discuss the robo-signer scandal, the problem with the MERS system and recent court cases involving MERS;

2.      Summarize the history of how land was surveyed and divided in the Western United States;

3.      Explain how junior and senior property rights are determined in the face of a boundary dispute;

4.      Describe exactly how MERS has destroyed or severely diluted chains of title for boundary disputes between foreclosed properties' subsequent owners and all of their neighbors;

5.      Analyze the resulting difficulty these subsequent homeowners and their neighbors will experience when attempting to sell their properties (with clouded titles) when purchasers will not be able to obtain title insurance (without seller indemnity) and financing.

II

## ROBO-SIGNER MORTGAGE FRAUD

Six months ago, the American public was unfamiliar with the term "robo-signer" describing loan processors and attorneys signing as many as 10,000 foreclosure documents a month.[10]   The so called robo-signers executed documents like robots, without review of the documents' contents.  These signatures became problematic in the 23 states that use the judicial process to foreclose on real property because the attorney or agent sign affidavits stating that

---

[10]Ariana Eunjung Cha and Brady Dennis, *Under Piles of Paperwork, a Foreclosure System in Chaos*, Washington Post (September 23, 2010).
http//www.washingtonpost.com/wp-dyn/content/article/2010/09/22/AR2010092206146.html

he/she has completely reviewed the file and certifies that the foreclosure documents comply with all statutes - all at the unimaginable rate of 500 documents a day.

A foreclosure mill is created in the following scenario. A loan is securitized through MERS (wherein MERS is presumably the mortgagee holding land title and is also named the nominee by the promissory note holder).  At this point the promissory note and the mortgage are separated.  The promissory note is then pooled with other promissory notes, repackaged, resold and haphazardly tracked (or not tracked at all) through the private MERS system but is not publically recorded. As promissory notes are sold and divided (tranches), assignments are not publically recorded and promissory notes were lost or misplaced. Subsequently, when a property goes into default, the foreclosing party must prove ownership (standing) to foreclose.  This becomes a problem. The last promissory note assignee, (who may or may not possess the promissory note) claims ownership.  Meanwhile, the land title mortgage may be held by MERS.

Banks have subsequently argued, with limited success, that even though separated, the mortgage actually follows the note.  It is the marriage of the promissory note (often times lost or non-existent) and the mortgage (after lost or non-existent assignments) that created robo-signer fraud.  Using robo-signers to falsify and recreate these previously lost or non-existent documents was the remedy created by the servicers – resulting in fraud, forgery and falsification of legal documents.  The irony of the foreclosure mills and robo-signers is that the front line bank teller requires multiple forms of identification, thumb prints and signature verifications while the same banks use robo-signers to create tens of thousands of forgeries.

Accurate foreclosure and loan paperwork is essential to properly foreclose on the correct residential property, after giving the owner proper notice and an opportunity to cure the defaulted mortgage.  Failure to properly review foreclosure paperwork and fabrication of documents, using inaccurate or incomplete information, results in wrongful eviction of homeowners and foreclosure on incorrect properties.  Many lenders (including Fannie Mae and Freddie Mac) turned to law firms ("foreclosure mills") that specialized in quick processing of thousands of foreclosures for banks.[11]

This conduct at foreclosure mills reached fraudulent levels and caused the fifty (50) states Attorneys' General to convene a committee to investigate this fraudulent activity by mortgage servicers.[12]  Additionally, the Office of the Comptroller of Currency, the Federal Reserve, the Office of Thrift Supervision and the Federal Deposit Insurance Corporation are negotiating with

---

[11] Stephanie Armour and Thomas Frank, *Ex-worker: Florida Law Firm Ran "Foreclosure Mill"*, USA Today (October 18, 2010).
http://www.usatoday.com/money/economy/housing/2010-10-18-witness-foreclosure-documents_N.htm

[12] Lorraine Woellert, Dakin Campbell and Carter Dougherty, *Mortgage Servicers Said To Agree to Fix Foreclosure Procedures*, Bloomberg (April 5, 2011).  See also Dave Clarke, *Update 1 – Iowa AG Looks To Foreclosure Deal Within 2 Months*, Reuters.com (March 7, 2011).

the largest U.S. mortgage servicers and signing consent decrees to improve foreclosure procedures.[13]

The Federal Reserve recently requested that Bank of America buy back residential mortgage backed securities ("RMBS"), exclusive of the commercial mortgage market, totaling $47 billion.[14]   These securities were called into question when authorities discovered the robo-signer problem.  Fannie Mae and Freddie Mac requested that Bank of America buy back RMBS totaling $5.6 billion in June 2010.[15]   Bank of America, in turn, sued the FDIC for $1.74 billion for buy backs.[16]   Bank of America has also sued First American Title claiming that First American has refused to cover more than 5,500 loans that have caused $535 million in losses.[17]

These issues will be sorted out in litigation and it will be interesting to see if banks have the capital to deal with these claims.

## III

## THE MERS SYSTEM

A.   <u>What Is MERS?</u>

MERS is a corporation registered in Delaware and headquartered in the Virginia suburbs of Washington, D.C.[18]   MERS operates a computer database designed to track servicing and ownership rights of mortgage loans anywhere in the United States.[19]   Originators and secondary market players pay inexpensive membership dues and per-transaction fees to MERS in exchange for the right to use and access MERS records.[20]   In addition to tracking ownership and servicing rights, when closing on home mortgages, many mortgage lenders now list MERS as the

---

[13]  Lorraine Woellert, Dakin Campbell and Carter Dougherty, *Mortgage Servicers Said To Agree to Fix Foreclosure Procedures*, Bloomberg (April 5, 2011).

[14] "Securitization" refers to mortgage loans pooled into trusts and converted into mortgage-backed securities that can be bought and sold by investors.  *U.S. Bank National Association v. Ibanez* (January 7, 2011, SJC-10694), slip opinion found at www.massreports.com/SJCCases/

[15]  ADMIN Staff, *Bank of America Corp. (NYSE: BAC) Has $11.1 Billion In Mortgage Purchase Requests*, American Banking and Market News (August 9, 2010). http://www.americanbankingnews.com/2010/08/09/bank-of-america-corp-nyse-bac-has-11-1-billion-in-mortgage-purchase-requests/#

[16]  Karen Gullo, *FDIC Sued By Bank of America Over Taylor Bean Mortgage Losses*, Bloomberg (October 19, 2010).   http://www.bloomberg.com/news/2010-10-20/bank-of-america-sues-fdic-over-taylor-bean-mortgage-s-1-75-billion-losses.html

[17] David Mildenberg, *Bank of America Sues First American On Lien Protection Claims*, Bloomberg Businessweek (February 22, 2011).

[18] Carson Mullen, *MERS: Tracking Loans Electronically*, Mortgage Banking (May 31, 2000), pg. 63.

[19] Howard Schneider, *MERS Aids Electronic Mortgage Program*, Mortgage Banking (January 1, 1997), pg. 42.

[20] *Id.*

"mortgagee of record" on the paper mortgage rather than the real mortgagee.[21]   MERS was designed to improve the efficiency and profitability of the primary and secondary mortgage markets.[22]   The benefit of naming MERS as the nominal mortgagee of record is that when the member transfers an interest in the mortgage loan to another MERS member, MERS privately tracks the assignment within its system but remains the mortgagee of record in publicly recorded documents.[23]   In 2011, MERS proposed a rule change to stop members from foreclosing in its name.[24]

## A.    MERS Connection To Sub-Prime Loans and Securitization

Before 1995, a qualified home buyer applied for a mortgage loan (whole-loan) with his/her local bank, credit union or savings and loan.[25]   The credit worthy borrower agreed to make payments until the mortgage debt was paid in full.  Beginning in approximately 1995, a new breed of loan came into play – the sub-prime loan.  These loans (often times for 100% or more of the market value of the residential property) and no longer dependent upon a borrower's credit worthiness, changed the landscape of mortgage lending, leading in part, to the current foreclosure crisis.  These loans were created and then supported by law makers.  For example, according to Congresswoman Maxine Waters:

> "Under the outstanding leadership of Mr. Frank Raines, everything in the 1992 act has worked just fine.  In fact, the GSE's [Fannie and Freddie] have exceeded their housing goals.  What we need to do today is to focus on the regulator and this must be done in a manner so as not to impede their affordable housing mission.  A mission that has seen innovation flourish from desktop underwriting to one hundred percent loans." [26]   [emphasis added]

We can be sure that Representative Waters wishes she could pull back this statement.

Mortgage lenders, knowing that their borrowers were not credit worthy and that the borrowers' home mortgages would almost certainly end in default, unloaded these loans as

---

[21] R.K. Arnold, *Yes, There Is Life On MERS*, 11 Prob. & Prop. (July/August 1997), pgs. 32-34.

[22] John R. Hooge and Laurie Williams, *Mortgage Electronic Registration Systems, Inc.: A Survey of Cases Discussing MERS Authority To Act*, Norton Bankruptcy Law Advisor (Thomas Reuters, August 2010) Issue No. 8.

[23] *Id.*

[24] Laura Marcinek, *BofA, Citigroup Say Mortgage Database Draws Scrutiny In Foreclosure Probe*, Bloomberg (March 2, 2011).

[25] Scot Paltrow and Leslie Adler (editor), *Factbox: The Role of MERS In Foreclosure Furor*, Reuters, Edition US (October 13, 2010).  http://www.reuters.com/article/idUSTRE69C69720101013

[26] *Congresswoman Maxine Waters* (D-CA) in a September, 2003, hearing of the House Committee on Financial Services.

quickly as possible to large institutional banks, who, in turn, bought and sold them amongst themselves and subsequently pooled the loans into trusts and converted them into mortgage backed securities (also referred to as collateralized debt obligations or "CDOs" - meaning that the asset behind the paper is real property) that could be bought and sold by and to investors.[27] These mortgage backed securities were almost uniformly rated AAA or Aaa by Fitch, Moody's and Standard & Poors.[28]   The AAA rating was appealing to risk adverse investors and the mortgage backed securities ended up in conservative pension funds such as CalPERS and conservative investment brokerage funds owned by companies such as MetLife, Blackrock, Inc. and Allstate.[29]  In the midst of creating these trusts and mortgage backed securities, MERS was created to shuffle these loans quickly between lenders leaving homeowners unable to find out who actually owned their mortgage at any given time.[30]

> "Mortgages would be changing hands dozens of times, going from loan originators to banks to Wall Street investment houses, which would collect them by the thousands and package them in complex debt instruments that would be chopped up into shares and sold off to multiple investors all over the world." [31]

## B.    What Is Wrong With MERS

MERS was set up to electronically move paper at a high rate of speed to accommodate the securitization of mortgages and to avoid the time and cost associated with the local county recording process.  The creation of MERS allowed mortgage companies to list MERS as the proxy for the true mortgage holder in local government records and to record subsequent changes of ownership in the MERS system only.[32]  After the financial collapse of 2008, MERS began foreclosure actions on behalf of lenders.[33]  A spokeswoman for Fannie Mae told the Times that

---

[27] Levine, Yasha, *Dude, Where's My Mortgage? How a Corrupt Outfit Called MERS Is Destroying Our System of Property Rights*, The eXiled (2010).

[28] Peter Cohan, *Behind the $4 Trillion in CDOs: Sneaky Banks and Worthless Ratings*, Daily Finance - An AOL Money and Finance Site (April 26, 2010) (also stating that 93% of the rating AAA were downgraded to junk). http://www.dailyfinance.com/story/explaining-the-4-trillion-cdo-scam-worthless-ratings-hide-inve/19452807/

[29] Analyst Blog – Zack's Investment Research, *Allstate Sues BofA on MBS Purchase* (December 30, 2010). http://www.zacks.com/stock/news/45341/Allstate+Sues+BofA+on+MBS+Purchase

[30] This lack of knowledge often led to payments made to the wrong bank or lender because the homeowner could not look to publicly recorded deeds to determine the ever changing identity of their lender. Michael Grover, *Fed-led Research Reveals Need For Better Twin Cities Foreclosure Data*, The Federal Reserve Bank of Minneapolis (September 2006). http://www.minneapolisfed.org/publications_papers/pub_display.cfm?id=2200

[31] Levine, Yasha, *Dude, Where's My Mortgage? How a Corrupt Outfit Called MERS Is Destroying Our System of Property Rights*, The eXiled (2010).

[32] Marian Wang, Backgrounder:  *A Closer Look at MERS, the Industry's Controversial Mortgage Clearinghouse*, ProPublica (March 7, 2011) [emphasis added].

[33] Robbie Whelan, *Lawmaker Questions Power To Foreclose*, The Wall Street Journal, Real Estate Section (November 1, 2010). http://online.wsj.com/article/SB10001424052748704865104575588791583567372.html

the company could never rely on MERS to find ownership of a loan.[34] In 2010, Alan M. White, a law professor at Valparaiso University Law School in Indiana, matched MERS ownership records against those in the public domain and found that fewer than 30 percent of the mortgages had an accurate record in MERS.[35]  Robo-signed documents, inaccurate or non-existent record keeping, the failure to publically record assignments of mortgages and the use of MERS as the mortgagee or nominee have led to the homeowners' inability to figure out who owns and is servicing their mortgages or to trace back their chain of title in a boundary dispute.   In using the inaccurate and alleged fraudulent MERS system, banks are actually denying homeowners their due process rights before losing their homes to foreclosure.

As stated above, MERS system allowed the lenders to avoid the time and expense of going through the County Recorder's office to file and record title documents.  This practice means that MERS also robs County Recorders of filing fees.  In fact, various county recorders have begun to take action attempting to recoup some of these fees.  In Massachusetts, South Essex Register of Deeds John O'Brien reported that he had received a green light to withdraw what could be millions of dollars from Bank of America accounts by arguing that banks have used MERS to deny the South Essex registry millions of dollars in fees to which it was entitled.[36]

Homeowners' attorneys argued that MERS did not have a right to initiate foreclosure actions because MERS did not hold the title and the corresponding note to the properties.[37] These same attorneys also argued that the MERS system did not accurately show exactly which lender holds title via a trust deed on the foreclosed property.  Furthermore, MERS created an enormous problem because, even if a property is successfully foreclosed upon by a lender via MERS (that does not actually have title and the corresponding note to the property), that lender may be prohibited from reselling the property. The lender cannot sell that which it does not own.  According the recent rulings, without proof of title and the note there is no standing to foreclose.[38]

MERS was set up without considering how it would destroy or seriously dilute accurate and recorded chain of title records, in the event of mass foreclosures, thereby taking away property rights, legal theories and defenses available to all property owning Americans –

---

[34] Marian Wang, Backgrounder:  *A Closer Look at MERS, the Industry's Controversial Mortgage Clearinghouse*, ProPublica (March 7, 2011).

[35] Marian Wang, Backgrounder:  *A Closer Look at MERS, the Industry's Controversial Mortgage Clearinghouse*, ProPublica (March 7, 2011).

[36] Eric Convey, *Deeds Head Gets OK To Yank BofA Funds*, Boston Business Journal (April 6, 2011).  See also Austin Kilgore, *Recorder Wants To Close Account At Bank of America To Protest MERS*, National Mortgage News (April 11, 2011).

[37] See Section II (D) below.

[38]  See *U.S. Bank National Ass'n v. Ibanez* (January 7, 2011) 458 Mass. 637, 2011 Mass. LEXIS 5;  See also *In re Agard* (United States Bankruptcy Court, Eastern District of New York, February 10, 2011) Case No. 8010-77338, Doc. 41.  http://findsenlaw.files.wordpress.com/2011/02/ny-bk-in-re-agard-feb-2011.pdf

including Americans who never went into foreclosure.  Already, proofs of titles (chains of title) have been lost in the frenzy of trading and packaging these mortgages into mortgage backed securities. Today, MERS servicers and related foreclosure mills are literally breaking a centuries old custom that protected property rights by requiring every sale of property to be publically recorded (pursuant to race/notice statutes) and requiring that any creditor claiming a right to foreclose demonstrate clear title (with an endorsed note in the creditor's name and a record at the county office showing transfer of the property).

Homeowners can no longer search public records to find out who held their mortgage because the record shows MERS as the mortgage holder and/or the purchaser of the foreclosed property, even though financial entities may act as a trustee to transactions.  In the event the chain of title is lost, MERS has a negative effect on the mortgaged homes, and each adjoining property adjacent to those homes (even those homes with no mortgage).  See <u>Section V</u> below. See also <u>Exhibit E</u>.

In defense of the MERS business model, MERS CEO and President R.K. Arnold has suggested they followed a model put forth by the GSEs' (Fannie and Freddie).[39]  There are few redeemable qualities or procedures put forth by the GSEs.  If not for the taxpayers they would have failed due to an accounting scandal which occurred long before the current crisis.

A lender's desire to quickly kick out a family, rack up fees and then sell the same house again, is no reason to deny every American homeowner the same due process protections historically given to them by keeping accurate and recorded title records and by allowing the judicial system to require proper notices, deeds and signatures before evicting Americans thereby satisfying Wall Street.  Bank of America CEO Brian Moynihan stated these loans will be fought "day-to-day, hand-to hand-combat" presumably one loan at a time.[40]To say Wall Street didn't know or understand real property laws is entirely ridiculous.  Real property is taught to every first year law student and Wall Street is certainly loaded with lawyers.  Arguably, it was the skullduggery of Wall Street's attorneys together with the MERS member organizations that created the toxin which will result in their demise.

MERS is simply not a viable substitute for the 400 year old system of publicly recording deeds (pursuant to race/notice statutes) available for anyone to reference in determining property rights.

C.    <u>Recent Court Rulings Regarding MERS and Securitization</u>

MERS and securitization problems have been coming to light in several publicized court cases.  A sampling of these recent cases includes:

---

[39] Arnold, R.K., *Remarks and Testimony, Before the Senate Committee on Banking, Housing and Urban Affairs*, (November 16, 2010).

[40] Hugh Son and David Mildenberg, Bank of America In Hand-To-Hand Combat Over Mortgage Disputes, CEO Says, Bloomberg (November 16, 2010).

1.  ___U.S. Bank National Association v. Ibanez___

The Massachusetts Supreme Court recently (January 7, 2011) affirmed a lower court's invalidation of two home foreclosures, stating that lenders Wells Fargo Bank and US Bank had failed to prove that they owned the mortgages.[41] The Massachusetts case, entitled *U.S. Bank National Association v. Ibanez* (January 7, 2011) 458 Mass. 637, 2011 Mass. LEXIS 5 *("Ibanez")* dealt with loans that had been pooled into mortgage-backed securities. The two foreclosures were made in the names of Wells Fargo and US Bank, however, neither of the banks had written mortgages.[42] Instead, they were acting as trustees, or financial caretakers, for pools of loans made and serviced by other lenders.[43]

In *Ibanez*, the Massachusetts' Supreme Court stated:

> "We agree with the judge that the plaintiffs, who were not the original mortgagees, **failed to make the required showing that they were the holders of the mortgages at the time of foreclosure.** As a result, they did not demonstrate that the foreclosure sales were valid to convey title to the subject properties, and their requests for a declaration of clear title were properly denied."[44]

The Court stated that, for plaintiffs to obtain the judicial declaration of clear title, they had to prove their authority to foreclose under the power of sale and show their compliance with the requirements on which this authority rests.[45] Plaintiffs could not provide this proof.[46] Plaintiffs had the authority to exercise the power of sale contained in the mortgages *only* if they were assignees of the mortgages at the time of the notice of sale and subsequent foreclosure sale.[47] Furthermore, the Court held that, like a sale of land itself, the assignment of a mortgage is a conveyance of interest in land that requires a writing signed by the grantor.[48]

---

[41] E. Scott Reckard, *Foreclosure Ruling Could Be Setback For Banks*, Los Angeles Times (January 7, 2011). latimes.com/business/la-fi-foreclosure-ruling-20110107,0,7857552.story

[42] *Id.*

[43] *Id.*

[44] *U.S. Bank National Association v. Ibanez* (January 7, 2011) 458 Mass. 637, 2011 Mass. LEXIS 5 [emphasis added].

[45] *Id.*

[46] *Id.*

[47] *Id.* (citing *In re Schwartz* (Bankr.D.Mass.2007) 366 B.R. 265, 269 ("acquiring the mortgage after the entry and foreclosure sale does not satisfy the Massachusetts statute").

[48] *Id.*

In *Ibanez*, the Supreme Court of Massachusetts ruled that defendants' foreclosures must be undone because industry securitization practices violated real estate law governing how mortgages may be transferred.[49]   Massachusetts is one of 27 non-judicial foreclosure states. Although this ruling is only binding in Massachusetts, we can expect the other 26 states to more closely examine their previous lower court rulings.  The end result may be an individual homeowner that owes the holder of their note the dollar value of the mortgage on the property, however, the property itself is no longer collateral for the loan.

Other courts have agreed with the reasoning in *Ibanez*.  For example:

> "It is the general rule that courts have power to vacate a foreclosure sale where there has been fraud in the procurement of the foreclosure decree or where the sale has been improperly, unfairly or unlawfully conducted, or is tainted by fraud, or where there has been such a mistake that to allow it to stand would be inequitable to purchaser and parties."[50]

The *Ibanez* problem highlights the flaws with the securitization process and the MERS system, the failure to publically record deed transfers and conveyances (along with sloppy paperwork) led these mortgage transfers to be deemed invalid.

2.    *In re Agard*

In the course of the bankruptcy case of *In re Agard*, a creditor sought relief from an automatic stay to foreclose on a second interest in the debtor's real property.[51]   MERS, as an intervener, argued that the terms of its membership agreement with the original lender and its successors in interest, as well as New York state agency laws, gave MERS the authority to assign a mortgage.[52]   MERS argued that it held legal title to mortgages for its members/lenders as both "nominee" and "mortgagee of record."[53]

In his highly critical response to MERS's request that the Court analyze the MERS business model, Judge Robert E. Grossman stated:

---

[49] Thom Weidlich, *Foreclosures May Be Undone by Massachusetts Ruling on Mortgage Transfers*, Bloomberg (January 6, 2011).  www.bloomberg.com/news/print/2011-01-06

[50] *6 Angels, Inc. v. Stuart-Wright Mortgage, Inc.* (2001) 85 Cal. App. 4th 1279, 1286.  See also *In re Agard* (United States Bankruptcy Court, Eastern District of New York (February 10, 2011) Case No. 8-10-77338, Doc. 41. http://findsenlaw.files.wordpress.com/2011/02/ny-bk-in-re-agard-feb-2011.pdf

[51] *In re Agard* (United States Bankruptcy Court, Eastern District of New York, February 10, 2011) Case No. 810-77338, Doc. 41.

[52] *Id.*

[53] *Id.*

> "The Court recognizes that an adverse ruling regarding MERS's authority to assign mortgages or act on behalf of its members/lenders could have a significant impact on MERS and upon the lenders which do business with MERS throughout the United States. . . . This Court does not accept the argument that because MERS may be involved with 50% of all residential mortgages in the country, that is reason enough for this Court to turn a blind eye to the fact that this process does not comply with the law. [54]

The Court rejected MERS arguments that it acted as nominee, mortgagee or agent adding that "in all future cases which involve MERS, the moving party must show that it validly holds both the mortgage and the underlying note in order to prove standing before this Court." [55]

### 3.   *In re Salazar*

In the United States Bankruptcy Court, Southern District of California case entitled *In re Salazar*, debtor Salazar sought to reinstate his US Bank loan against his residence and cure his default, and creditor US Bank sought relief from stay in the bankruptcy to proceed with its unlawful detainer action. [56]   The Court held:

> "US Bank, as the foreclosing assignee, was obligated to record its interest before the sale despite MERS' initial role under the deed of trust, and this role cannot be used to bypass [California] Civil Code section 2932.5.[57]   Since US Bank failed to record its interest, Salazar had a valid property interest in his residence that is entitled to protection through automatic stay."[58]

In *Salazar*, the Court concluded that MERS original involvement in the loan did not provide talismanic protection against US Bank's foreclosure deficiencies, that US Bank's failure to record its beneficiary status before foreclosure left Salazar with equitable title to his residence and that Salazar had demonstrated a prima facie case that the foreclosure sale was void.[59]   "The

---

[54]   *Id.* [emphasis added].

[55]   *Id.*

[56]   *In re Salazar* (United States  Bankruptcy Court, Southern District of California, April 11, 2011) 2011 Bankr. Lexis 1187.

[57]   California Civil Code § 2932.5 requires a creditor to record an assignment of its interest before foreclosure.  In order to comply with this statute, US Bank had to (1) be entitled to payment of the secured debt and (2) US Bank's status as foreclosing beneficiary appear before the sale in the public record title for the property.  *In re Salazar*, supra, 2011 Bankr. Lexis 1187.

[58]   *In re Salazar*, supra, 2011 Bankr. Lexis 1187.

[59]   *Id.*

borrower concern addressed by California Civil Code section 2932.5 – that it be able to identify the assignee of its loan – is more exigent, not less, than it was during the Great Depression." [60] The Court held:

> "The Court rejects the claim that MERS' limited role in the DOT [deed of trust] provides it carte blanche authority over the non-judicial foreclosure process."[61]

See also Michigan Court of Appeals opinion dated April 21, 2011 holding that MERS is not a proper party to conduct a foreclosure by advertisement under Michigan Law.[62]  In this opinion, the Michigan Court of Appeals held that defendants were not entitled to judgment as a matter of law because, pursuant to Michigan statute, "MERS did not own the indebtedness, own an interest in the indebtedness secured by the mortgage, or service the mortgage and MERS inability to comply with the statutory requirements rendered the foreclosure proceedings in both cases void ab initio."[63]

See also *In re Vargas*[64] (denying relief from bankruptcy stay, imposing sanctions and stating that MERS had failed to prove that it was the proper party to enforce the note and that MERS was not able to prove the identity of the current note holder); In re Walker [65] (claimant of note was not allowed to assert claim of property when it failed to present evidence that the nominee (MERS) had any interest in the note to transfer to claimant).

<div align="center">

IV
### LAND DIVISION AND CHAIN OF TITLE
### IN THE UNITED STATES

</div>

A.    A Brief History Lesson

What does it mean to be an American? Arguably, in the broadest sense, the answer is freedom. When coming to the New World, European settlers sought freedom from religious persecution and freedom to own, develop and occupy land.  The concept of land title is uniquely American.  Historically, Native Americans had no concept of written title because they did not believe that any person could "own" land.  European settlers changed this belief by imposing the concept of land ownership by individual people on the New World of America.  Today, the

---

[60] *Id.*

[61] *Id.*

[62] *Residential Funding Co., LLC* v. *Saurman and Bank of New York Trust Company v. Messner* (consolidated) (State of Michigan Court of Appeals, April 21, 2011) 2011 Mich. App. Lexis 719.

[63] *Id.*

[64] *In re Vargas* (United States Bankruptcy Court, Central District of California, 2008) 396 B.R. 511.

[65]  In re Walker (United States Bankruptcy Court, Eastern District of California, 2010) 2010 Bankr. Lexis 3781.

concept of **stable** individual "land ownership" separates America from most of the rest of the world.  In the United States, the following key concepts are true:

- Real property law rights and defenses all tie to accurate and publically recorded chain of title and property ownership records at the county level.

- Accurate publically recorded chain of title documents are critical in determining land ownership (senior and junior property rights) avoiding the need for litigation.

- There is no federal law governing private property rights.  Therefore, a federal system of title (electronic or otherwise) is not feasible.

- Each state has its own property laws and is individually responsible for maintaining records at the county level in conformance with the UCC.

- The stability of the land title is paramount in preserving land ownership and maintaining civil harmony.

- Real property is a secure and valuable investment.

- Land equates with wealth and it is our second most valuable resource.

As early as 1891, the California legislature recognized that land subdivided by way of a written description was prone to title defects, gaps, gores and overlaps which resulted in expensive litigation.  At that time, California (and most other states) enacted laws that required a land surveyor to file a **public record** each time one of these property lines was established by a surveyor.  These laws were intended to make the property line determinations available to the public, thus avoiding litigation to resolve disputes associated with unfiled records or unclear boundaries.

For the Western United States, the history of land division began with the Louisiana Purchase of 1803.  According to this statute and pursuant to the Land Act of 1805, land was to be surveyed west of the Mississippi River all the way to California (excluding Texas at that time).  Government Land Office ("GLO") surveyors, beginning in Ohio, were tasked with subdividing land into one square mile sections – each containing 640 acres.  Historically, most properties with a metes and bounds description have potential inaccuracies. Of the thousands of sections of land (640 acre parcels) surveyed after the Louisiana Purchase of 1803 and the Land Act of 1805, between the Mississippi River and the Pacific Ocean, no two parcels are exactly the same when measured on the ground due to rough terrain, bad weather, antiquated instruments and, sometimes, surveyors' failure to survey at all. [66]

---

[66] Francois D. Yzes, *Chaining the Land:  A History of Surveying In California* (1977).  See also Anne L. Hoppe, PLS, MSCE, *Subdividing California:  The Evolution of the Subdivision Map Act*, California Surveyor (Winter 2010).

These subdivided 640 acre parcels were sold/homesteaded based on a government plat showing perfect rows of sections; however, these only existed on paper.[67] The differences between sections varied from a few inches to several hundred feet or even several acres.  Like snowflakes, each 640 acre section is different. In California, modern day surveyors are still discovering undocumented fraud dating back to the 1870s. These discrepancies are uncovered today when a survey is completed because one neighbor wants to remodel, put in a fence and/or a boundary dispute arises between neighbors.  Even today in California, alleged land surveying fraud is prevalent and the statutes governing the practice are frequently ignored.

Keeping this history in mind, it is easy to see why material discrepancies in title arise and become the basis of land boundary litigation. The only way to resolve these boundary locations, absent litigation, is by examination of the chain of title to determine senior and junior property rights and divide the land according to these principles.  Without a clear chain of title, resolution of land boundary disputes is dependent upon complex and expensive litigation, or at a minimum, a combination of land surveying and dispute resolution among the parties and their counsel.

B. **The Surveyor's Role** – Determining Senior and Junior Property Rights In Sequential Property Conveyances

As a practical matter, the law (and surveyors) deal with boundary discrepancies discovered by surveys (without the need for litigation) by examining the chain of title (found in publically recorded documents and grantor/grantee indexes) back to the original grantor to determine senior and junior rights for sequential conveyances.   A piece of real property's history of conveyances from one owner to another is called a "chain of title."   Chain of title is specifically defined as:

> "record of successive conveyances, or other forms of alienation, affecting a particular parcel of land, arranged consecutively, from the government or original source of title down to the present holder." [68]

Because only evidence of ownership is recorded in these public records, to prove ownership of a particular parcel, a property owner must show a continuous title record back to the first conveyance that described the parcel.  The compilation of all title ownership is known as the chain of title or chain of record.[69]  When a portion of a tract of land is sold, two or more parcels are created including a new parcel and the remainder of the parent parcel.[70]  A parcel is apportioned according to well settled principles found in race/notice statutes. Because the new parcel must receive all the land described, it is called the "senior deed" (or "senior parcel",

---

[67]  Francois D. Yzes, *Chaining The Land: A History of Surveying In California* (1977).

[68] Black's Law Dictionary (6th ed. 1990), pg. 229.

[69] Brown, Curtis M., Walter G. Robillard, Donald A. Wilson, *Brown's Boundary Control and Legal Principles*, supra, Glossary, pg. 432.

[70] *Id.* at § 11.2, pg. 301.

"senior rights") and the remainder, at the time of conveyance, becomes the "junior deed". (or "junior parcel", "junior rights").[71] "Sequential conveyances" are those written deeds in which junior and senior rights exist between adjoining parcels.[72] See Exhibit H for definition of sequential and simultaneous conveyances.  Stated another way, the first (in time) conveyance by deed is called the senior conveyance.  The next (in time) conveyance by deed is called the junior conveyance.  Three well established principles in law and in surveying are stated as follows:

1. "As between private parties in a land dispute, a senior right is superior to a junior right."[73]

2. "As between private parties, a junior grant, in conflict with a senior grant, yields to the senior grant."[74]

3. A grantor cannot convey what he does not own.[75]

4. Between equal equities, the first in order of time shall prevail.[76]

These principals establish the rights of the parties when excesses or, more importantly, when deficiencies in the amount of land conveyed to two parties occurs.  California statutes regulate the transfers of real property within California.[77]  See Exhibit B.  Most states have adopted the same or similar statutes.

1.   Diagram A

---

[71] *Id.*

[72] *Id.*

[73] *Id.* at § 11.1, pg. 297.

[74] *Id.* at § 11.6, pg. 303.

[75] *Caselli v. Messina* (1990) 567 NYS 2d 972.

[76] Maxims of Equity, Wikipedia (http://en.wikipedia.org/wiki/Maxims_of_equity) (citing Richard Edwards, Nigel Stockwell (Pearson Education, 2005) *Trusts and Equity*, pg. 34).

[77] See Exhibit B, California Civil Codes

## Diagram A
## NORMAL CONVEYANCE (NON MERS)



1. B and C now have a problem. How is A's original parcel divided?
2. The division between B and C is determined by examining the chain of title (found in publically recorded documents and the grantor/grantee indexes) back to the original grantor A.
3. B acquired the East 50 ft from A in 1960 leaving A with 45 ft.
4. C acquired the West 50 ft from A in 1970, however, A only had 45 ft left to convey.
5. Because B acquired his 50 ft first in time (superior), he keeps 50ft and C keeps the remaining 45 ft (junior).
6. C's deed is reformed to reflect 45 ft and this document is recorded.

This basic example shows the importance of a clear chain of title in determining property rights in sequential conveyances, particularly when dealing with a previously flawed survey or an ambiguous conveyance.  In the event that the chain of title cannot be recovered, owners will be forced to litigate boundaries because they will not be able to determine the senior rights – the exact problem created by MERS.  See Diagram B below.

The surveyor (and the courts) study the chain of title from recorded public deeds/title documents to determine senior and junior rights designations based on the portion of the parcel that was conveyed first in time (pursuant to race/notice statutes) by the original grantor. Based on existing case law, this boundary determination is made clearly and accurately without the need for litigation as to the location of the property lines.  Diagram A shows the importance of a clear chain of title.

In the event the chain of title cannot be recovered, owners will be forced to litigate boundaries because they will not be able to determine senior rights.  In the event that the parties are not contentious, they may opt to have a boundary line agreement (not available in all states) which is very expensive, time consuming (years) and if done incorrectly will further exacerbate the problem. In order for a boundary line agreement to be binding, the owner must obtain a modified deed of trust.

V

## HOW MERS HAS BROKEN OR DILUTED CHAIN OF TITLE FOR BOUNDARY DISPUTES BETWEEN FORECLOSED PROPERTIES AND ALL OF THEIR NEIGHBORS

In the midst of buying and selling mortgages between banks and creating mortgage backed securities, MERS was created to shuffle home loans quickly between lenders, leaving homeowners unable to find out who actually owned their mortgage at any given time.[78]  In addition to tracking ownership and servicing rights, when closing on home mortgages, mortgage lenders now often list MERS as the "mortgagee of record" on the paper mortgage rather than the real mortgagee.[79]  The mortgage is then recorded with the county property recorder's office under MERS, Inc.'s name rather than under the lender's name.[80]  Historically, employees of county recording offices kept records of each individual company that recorded mortgage loans and mortgage loan assignments but not today – today MERS is the only company listed.[81]

In this process, while MERS holds mortgages as the 'mortgagee of record" while promissory notes were separated and sequentially transferred from community bank to larger bank to investment bank to mortgage backed security without these transfers between banks ever

---

[78] This lack of knowledge often led to payments made to the wrong bank or lender because the homeowner could not look to publicly recorded deeds to determine the ever changing identity of their lender. Michael Grover, *Fed-led Research Reveals Need For Better Twin Cities Foreclosure Data*, The Federal Reserve Bank of Minneapolis (September 2006). http://www.minneapolisfed.org/publications_papers/pub_display.cfm?id=2200

[79] R.K. Arnold, *Yes, There Is Life On MERS*, 11 Prob. & Prop. (July/August 1997), pgs. 32-34.  See also Christopher L. Peterson, *Foreclosure, Subprime Mortgage Lending and the Mortgage Electronic Registration System*, University of Cincinnati Law Review (Summer 2010) Volume 78, No. 4 for a comprehensive explanation of the MERS process.

[80] Christopher L. Peterson, *Foreclosure, Subprime Mortgage Lending and the Mortgage Electronic Registration System*, University of Cincinnati Law Review (Summer 2010) Volume 78, No. 4, pg. 1361.

[81] *Id.* at 1362.

being publically recorded or traceable in the grantor/grantee indexes.[82] Sometimes, these transfers are documented in the MERS system (rather than the county property recorder's office) and sometimes they are never documented at all.[83] MERS then initiates foreclosure actions on behalf of lenders.[84]  As stated above, courts have held that MERS lacks standing to foreclose on a particular property and, many times, the actual owner of the property cannot even be determined because of falsified (robo-signed), back-dated or lost/non-existent records.

This phenomenon also means that the property's chain of title is lost in public records or severely diluted (because it cannot be traced amongst the hundreds of thousands of MERS transactions).  If the chain of title is lost for a foreclosed property, any property that shares a common property boundary line with that foreclosed property may have also lost its senior rights in a boundary dispute.  Additionally, because of clouded titles, both foreclosed properties and their neighbors may not be able to sell their properties because buyers will not be able to obtain title insurance (or provide the same warranty deed issued by a lender) and consequently, buyers will not be able to obtain financing.

Currently, it is estimated that MERS holds over half of all mortgages in the United States – approximately 60 million mortgages [85] and, in the event the chain of title is lost, MERS has a negative effect on the mortgaged homes, and each adjoining property adjacent to those homes (even those homes with no mortgage).

A.   <u>Diagram B</u>

As an example of these principles, see <u>Diagram B</u> on the next three pages.

---

[82] See Marian Wang, *Backgrounder: A Closer Look at MERS, the Industry's Controversial Mortgage Clearinghouse*, ProPublica (March 7, 2011).

[83] *Id.*

[84] Robbie Whelan, *Lawmaker Questions Power To Foreclose*, The Wall Street Journal, Real Estate Section (November 1, 2010). http://online.wsj.com/article/SB10001424052748704865104575588791583567372.html

[85] Michael Powell and Gretchen Morgenson, *MERS? It May Have Swallowed Your Loan*, The New York Times (March 6, 2011 Late Edition).

## Diagram B
## MERS CONVEYANCE

Original Grantor

A

A conveys East 50 ft to B in 1960. Conveyance is recorded and traceable in grantor/grantee index.

Original grantor A believes he owns 100 ft but he really owns 95 ft.

| A | B |
|---|---|
| Remainder (1960) | East 50 ft (1960) |

A conveys East 25 ft of his remaining parcel to C in 1965. Conveyance is recorded and traceable in grantor/grantee index.

| A | C | B |
|---|---|---|
| Remainder (1965) | East 25 ft (1965) | East 50 ft (1960) |

A conveys his remaining 20 ft to D in 1970.  It is conveyed as 25 ft because A thinks he has 25 ft left to convey. Conveyance is recorded as 25 ft and is traceable in grantor/grantee index.

| D | C | B |
|---|---|---|
| Remainder (1970) | East 25 ft (1965) | East 50 ft (1960) |

At this point, if a survey reveals that the original parcel A contained 95 ft, normal rules determine junior and senior rights without the need for litigation. Tracing back to grantor A, B will get 50 ft (1960), C will get 25 ft (1965), E will get the remaining 20 ft (D acquired 20 ft in 1970 from A).

D conveys what he thinks is 25 ft to E  in 2008 ( it is really 20 ft). Conveyance is recorded and is traceable in grantor/grantee index.

| E | C | B |
|---|---|---|
| Remainder (2008) | East 25 ft (1965) | East 50 ft (1960) |

## NOW THE PROBLEM STARTS

## NOW THE PROBLEM STARTS

### MERS CONVEYANCE



Bank Three (note holder) conveys the foreclosed property to F in 2010.  There are several problems with this conveyance:

### First Set of Problems:

1.  Bank Three cannot prove it actually owns title to the property because the note and the mortgage were separated in 2009 (MERS held the mortgage and the note was assigned to Bank One, Bank Two and Bank Three in a series of transactions and none of the transactions were recorded) – this is a wild deed.

    a.  Because Bank Three cannot prove they own title to the property to convey to F, F cannot obtain title insurance on the property unless Bank Three agrees to indemnify F (or provide a warranty deed) against any title claims or losses as part of F's title insurance policy.

Page 22 of 29

b.      Similarly, F cannot prove that he owns title to the property (clouded title/wild deed), therefore, F will have a problem selling the property because:

(1)     Realistically, F will not be able to indemnify a prospective buyer against any title claims or losses (as Bank Three had done for F);

(2)     A prospective buyer will not be able to obtain title insurance because the property's title is clouded and the property has a wild deed.  Without title insurance or a redeemable warranty deed, a prospective buyer cannot obtain financing (leaving only cash buyers);

(3)     A clouded title/wild deed will diminish the market value of the property when F tries to sell the property even if he can find a cash buyer.

## Second Set of Problems

2.      When F purchased the property in 2010, Bank Three believes that it was conveying 25 ft. to F.    F also believed that he was purchasing 25 ft.  F has a survey done in 2010 to determine boundaries.  In conducting the survey, the surveyor finds:

a.      The original grantor A (traced back from B and C properties) only had a total of 95 ft. to convey due to prior survey discrepancy.

b.      The surveyor must determine the senior rights between F, C and B in order to determine who gets what portion of the 95 ft. (senior and junior rights), however, this cannot be determined because:

(1)     F thinks he owns 25 ft., C thinks he owns 25 ft. and B thinks he owns 50 ft.

(2)     The surveyor cannot trace F's property back to E due to the MERS transactions, so you cannot determine whose conveyance came first in time (thus senior by race/notice statutes) F, B or C?

(3)     Therefore, the surveyor cannot determine who has senior and who has junior rights between F, B and C.

c.      Therefore, all three properties (F, B and C) now have unclear boundary lines creating a cloud on all three properties' titles.

(1)     F, B and C will have to disclose the boundary discrepancy when they attempt to sell their properties;

(2)     The boundary discrepancy will create a cloud on title for all three properties diminishing the properties' values;

(3)     The cloud on title will make it impossible for prospective buyers to obtain title insurance (and financing) on any of the three properties.

d.      Because of the broken/diluted chain of title and the boundary discrepancy, F, B and C will have to go to court to have their boundary lines adjudicated (even if they agree to a compromise) because a surveyor cannot make this determination absent a court order.  This process is expensive and time consuming, holding up land sales, disposition of estates and family trust and negatively affecting the American economy.

e.      The title industry can anticipate a litany of marketable title claims as the current owners must disclose their title issues to any prospective buyers – thus diminishing the property's value.  See <u>Exhibit D</u>.  See also *Mertens v. Berendsen* (1931) 213 Cal. 111, 113 (stating that "Marketable title must be so far free from defects as to enable the holder, not only to retain the land, but possess it in peace, and if he wishes to sell it, to be reasonably sure that no flaw or doubt will arise to disturb its market value").

B.   **A Purchaser's Inability To Obtain Title Insurance On A Foreclosed Property**
Processed Through MERS

Title insurance involves the issuance of an insurance policy promising that, if the state of the title is other than as represented on the face of the policy, and if the insured suffers loss as a result of the difference, the insurer will reimburse the insured for that loss and any related legal expenses, up to the face amount of the policy.[86]   See Exhibit C, sample language from title insurance policy. When a title insurance policy represents that a title search was made, it impliedly represents that the defects, impediments and other matters mentioned in the policy and excluded from coverage are the only ones disclosed by a search of public records (or disclosed on a new proper survey commissioned at the time the policy is issued) to the average person who has paid for a title search made in connection with a policy of title insurance, the policy itself serves as the abstract of title.[87]

MERS has broken or severely diluted the chain of title for foreclosed properties (See Diagram B above) and their neighbors (with sequential conveyances and a boundary discrepancy) and all will have clouded titles.  With clouded titles, subsequent purchasers will not be able to obtain title insurance, and in turn, they will also not be able to obtain financing. Because of these clouded titles, both foreclosed properties and their neighbors may not be able to sell their properties because buyers will not be able to obtain title insurance and financing.  Just as in Diagram B above:

1.   A bank cannot prove that it actually owns the foreclosed property because the note and the mortgage are separated creating a wild deed

2.   As a result, a subsequent buyer (buyer 1) may not be able to obtain title insurance unless the bank agrees to indemnify buyer 1 against any title claims or losses as part of buyer 1's title insurance policy.

3.   Even if the bank and the title insurer work together to provide title insurance to buyer 1 for the foreclosed property, when buyer 1 goes to re-sell the property buyer 2, buyer 1 will have a clouded title and wild deed and buyer 2 will not be able to obtain title insurance and financing without indemnity from buyer 1 (which in all likelihood buyer 1 cannot provide).

4.   This problem will diminish the value of the property to buyer 1 (and their neighbors with sequential conveyances and boundary disputes) and they will either not be able to sell it, only sell it to a cash buyer willing to have no title insurance and/or sell it at a reduced price because of the clouded title problem.

---

[86] *Lick Mill Creek Apartments v. Chicago Title Insur. Co.* (1991) 231 Cal. App. 3d 1654, 1658.  See also Cal. Ins. Code § 12340.1.

[87] *Banville v. Schmidt* (1974) 37 Cal. App. 3d 92, 100-108 *[emphasis added]*.

In October 2010, because of the problems with MERS (as described above), in order for an individual buyer to obtain title insurance on a foreclosed home purchased from a bank, the bank must provide a written indemnity to the title insurer and buyer stating that the bank actually owns the property and will defend against any subsequent claims on title.[88]  If banks are unwilling to provide this indemnity, title insurers were refusing to insure properties.  At one point in October 2010, Old Republic was reportedly refusing to write title policies for some foreclosures all together (although this policy was subsequently changed).[89]

A sample from an actual grant deed for a foreclosed property containing this indemnity language reads as follows:

> "Grantor covenants that it is seized and possessed of the said land and has a right to convey it, and warrants the title against unlawful claims of all persons claiming, by, through and under it, but not further otherwise."

See Exhibit K.

When this homeowner attempted to have his title insurer help him issue a new deed, he received no cooperation from the title company representative, and in fact, he was treated rudely.  Although he is currently persisting to have his deed reformed, thus far, he has run into a brick wall of bad advice and unreturned telephone calls from his insurer.

The GAO 07-401 reported on the nefarious loss and loss adjustment claims of title insurance premiums.[90]  The concept of title insurance is largely not understood by the average homeowner.  Title insurers pay few claims (usually high dollars) with only 5% of the premiums paid as losses (2005).  This extremely low claims acceptance rate is exemplified by the homeowner attempting to have his deed reformed.

Subsequently, the title insurance companies relaxed the indemnification requirement.[91]  Why?  The only thing holding the title companies together is a piece of duct tape and a stick of gum.  If one of the four major title companies were to break formation and require indemnity or refuse to insure foreclosures altogether, this would be the demise of the title industry.  Currently, title companies are being hit with large claims due to the loss of priority of liens and loans (another form of junior and senior rights).

---

[88] Danielle Kucera, *Fidelity National To Require Banks To Sign Foreclosure Warranty*, Bloomberg (October 20, 2010).

[89] Stephanie Armour, *Old Republic To Stop Writing Policies For Some Foreclosures*, USA Today.com (October 2, 2010).

[90] United States Government Accountability Office, GAO-07-401 (April 2007) *Talking Points Outline*, pg. 42.

[91] Danielle Kucera, *Fidelity National Drops Plan For Lender Foreclosure Guarantee*, Bloomberg (October 27, 2010).

## C.    The Torrens System – An Alternative

The only known alternative to the chain of title system is the Torrens system which registers the owner, not the land. Minnesota and Massachusetts (via the Massachusetts Land Court system) have established Torrens systems.  To institute a Torrens system, you must have a court finding that eliminates the necessity for a chain of title and a declaration of the property location.[92] Under the Torrens system, the owner's certificate of title defeats any competing claims not declared at the initial proceedings.[93] Furthermore, a Torrens system would require a survey and court costs for each individual property.[94]

Conceivably, if done properly, a Torrens system would take hundreds of years to create – not exactly a feasible solution.  Additionally, once established, each state must guarantee rights of ownership and establish a fund to pay the costs for errors in court determined ownership.  Although a Torrens system would, in essence, eliminate the need for title insurance, it would be too expensive and take too long to implement.  As it stands, there is simply no alternative to maintaining our chain of title system – a system that MERS has frustrated.

## D.    The Proposed National System – A Bad Idea

Recently, there have been calls to create a national system/standard for originating, selling and servicing mortgage loans.[95] The MERS system is an example of a flawed national system that did not take into account the fact that each state determines its own real property laws and recording system.  A nationalized system simply will not work.

Kurt Pfotenhauer, chief executive of the American Land Title Association, said MERS is an "elegant solution" to the inefficiencies of paperwork.[96] Although he would welcome more regulatory oversight, Pfotenhauer said title companies have found the database to be accurate and that its main flaw is that it doesn't contain every mortgage in America. This is a remarkable statement from a title insurance industry representative.  The idea may be to apply the golden rule.  He with all of the gold rules.  If MERS controlled all mortgages, maybe MERS would be

---

[92] Brown, Curtis M., Walter G. Robillard, Donald A. Wilson,  *Brown's Boundary Control and Legal Principles* (5th ed. 2003) § 3.7, pg. 46.

[93] *Id.*

[94] *Id.*

[95]  Christopher Whalen, *The Ibanez Decision: What It Means For Homeowners and Investors*, Reuters Edition US (January 10, 2011) (referencing *An Open Letter To U.S. Regulators Regarding National Loan Servicing Standards* (December 21, 2010).   http://blogs.reuters.com/christopher-whalen/2011/01/10/the-ibanez-decision-what-it-means-for-home-owners-and-investors)

[96] Ariana Eunjung Cha and Steven Mufson, *How The Mortgage Clearinghouse MERS Became A Villain In the Foreclosure Mess*, The Washington Post (December 30, 2010).
 http://www.washingtonpost.com/wp-dyn/content/article/2010/12/30/AR2010123003056.html

deemed too big to fail (like AIG).  However, land title is not about securities.  It just so happened that mortgage backed securities were formed as a market gamble.  Investors may have gambled and lost, however, MERS cannot be allowed to ruin land title as a result of this securitization.

Land ownership is local.   Each state has its own laws governing the real property and the laws applicable to one state cannot work in another state.  For example:

- Minnesota (Torrens system of title);

- California (subdivided by a public lands survey system with private holding "Ranchos" that predate statehood);

- Georgia and Texas (enacted their own laws irrespective of common law);

- Iowa (state run land title insurance program);

- Colonial New England states (comprising 20 plus states that are metes and bounds states).

These are simply states' rights issues.  In most instances, there are no federal laws describing real property rights.  Our land title system simply cannot be altered based on the secondary market created by Wall Street firms and banks that are only focused on buying and selling mortgages rather than how the MERS system has already started to destroy our land title records.

# VI

## C O N C L U S I O N

We cannot let Wall Street destroy 400 years of title by implementing and exploiting the MERS system to perpetuate alleged fraud in the mortgage lending industry.  As seen in this article, the robo-signer scandal is merely a symptom of all of the problems created by MERS.

MERS, a shell company with 45 employees and 20,000 Vice Presidents (paying $25.00 each for the right to use the MERS name), may destroy our land title records affecting all American homeowners (not just those unfortunate enough to face foreclosure) if appropriate actions are not taken.[97]   The elephant in the room not being acknowledged by the mortgage lenders (who once profiting from the buying and selling of bad mortgages and are now facing liabilities) as the ramifications of destroying 400 years of title records. Chain of title destruction boils down to the destruction of a basic American right – land ownership with a verifiable clear title. If states are forced to accept a new system, Americans will lose the legal theories that

---

[97] Ariana Eunjung Cha and Steven Mufson, *How The Mortgage Clearinghouse MERS Became A Villain In the Foreclosure Mess*, The Washington Post (December 30, 2010).
http://www.washingtonpost.com/wp-dyn/content/article/2010/12/30/AR2010123003056.html

establish and protect real property rights including marketable title,[98] prescriptive rights, acquiescence, equitable estoppels, adverse possession and others. Think about the following:

- If these conclusions are incorrect, why did the title insurance industry threaten to refuse to insure foreclosures in October 2010? [99]
- And what is the indemnity relationship between lenders and title insurers today?
- Do we really want to force Americans to litigate their property rights that were documented and maintained for nearly 400 years until the introduction of MERS?

## END OF REPORT.

---

[98] See Exhibit D for definition of "marketable title."  Typically, title insurance insures title to be marketable.  Items that can make title unmarketable are shown on the exhibit referenced.

[99] David Streitfeld, *Company Stops Insuring Title In Chase Foreclosures*, New York Times (October 2, 2010).



# Addendum One

# MERS/ZOMBIE LOANS QUESTIONS ANSWERED

**Forward:**

*The following addendum is in reference to a conversation with (name intentionally deleted).  Following up on the questions presented in our conversation of January 20, 2011, I assume that (name intentionally deleted) is familiar with the report initially submitted.*

**Fact Sheet:**

To foreclose on real property, a plaintiff must be able to establish the chain of title entitling him to relief.  Nevertheless, MERS has acknowledged, and recent cases have held, that MERS is a mere "nominee"— an entity appointed by the true owner simply for the purpose of holding properties in order to facilitate transactions.  Recent court opinions stress that this defect is not just a procedural defect, but is a substantive failure, one that is fatal to the plaintiff's legal ability to foreclose.[1]  Furthermore, if the lender has taken out title insurance for themselves to guarantee the viability of the title to these properties through the securitization process, then the title companies are already on the hook for claims on the first wave of unrecorded conveyances.

> "It's like a Microsoft Excel spreadsheet, only bigger. It doesn't have images of documents; it doesn't have signatures in it. It doesn't have copies of original documents," explained Christopher Peterson, a law professor at the University of Utah who has written several research papers on MERS.  "Members of the MERS system can put info on database if it feels like it," Peterson said. "MERS uses the word 'track,' they say they track servicing rights or ownership rights, but that's not really what they do. They're more of a passive information receptacle."[2]

***Sometimes*** MERS also tracks ownership rights (actual assignments), but only if investors willingly volunteer this information.[3] [emphasis added].   Most states (except Minnesota and Massachusetts) have a land title act which conforms to the statute of frauds – requiring that transactional documents be in writing, signed by the party to be charged, and filed with the

---

[1]  As examples see *U.S. Bank National Ass'n v. Ibanez* (January 7, 2011) 458 Mass. 637, 2011 Mass. LEXIS 5; *In re Agard* (United States Bankruptcy Court, Eastern District of New York, February 10, 2011) Case No. 8-10-77338, Doc. 41.
http://findsenlaw.files.wordpress.com/2011/02/ny-bk-in-re-agard-feb-2011.pdf
[2]  Debra J. Hood, *Home Foreclosures Halted Indefinitely As Title Insurance Company Jumps Ship* (October 7, 2010) Long Beach Examiner.
http://www.examiner.com/nonpartisan-in-long-beach/home-foreclosures-halted-indefinately-as-title-insurance-company-jumps-ship
[3]  Financial institutions have not reliably updated the MERS maintained database when they assign loans to businesses that are not members of the MERS system. See *In re Hawkins* 2009 WL 901766 (Bankr. D. Nev.2009)

county recorder's office making them available to the public.   Because not all of these transactional documents (i.e. the assignment of the promissory note, mortgages and deeds of trust) are part of the MERS system, they are no longer available to members of the public. This is very bad both because MERS violates that statute of frauds and because the public is no longer able to trace ownership and divisions of property through the "chain of title".

These transactional documents historically cannot be separated without being subject to nullity.  Ironically, trustees of residential mortgage backed securitized trusts also claim to own legal title to the same mortgages for which MERS claims to own title.[4]  Society (the general public) needs an authoritative, transparent source of information on who owns land in order to protect property rights, encourage commerce, expose fraud, and avoid disputes.[5]   Unlike most county real property recorders, MERS does not keep digital or hard copies of documents that embody real property agreements (negotiation of promissory notes and written assignment of the mortgages) making it much more difficult to track fraud and errors through the MERS record keeping system.  When asked whether MERS expects financial institutions to update the MERS database regarding changes in loan ownership, the company's CEO replied, "not so much…"[6]

This is exactly how the chain of title is broken.  Once chain of title is broken, senior and junior property rights established by order of conveyance (sequential conveyances - See **Exhibit H**) are lost. This means that the land surveyor, hired to delineate property lines, will not be able to properly document contiguity, gores and overlaps along the exterior boundaries of the surveyed premises.  Now the land boundaries are clouded, and the owner will need to have the particular property line determined (adjudicated) by the court system.  Having to rely on courts to quiet title will be a very slow and costly process that will surely hinder the conveyance and future development of property.

Furthermore, this type of title issue has such a direct effect on the marketability of title and insurability of title, it is specifically spelled out in the American Land Title Associations guidelines "*2005 Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys*". Most commercial property lenders will **not** provide a loan on property without the benefit of a land title survey.   The parties, lenders and title insurers, understand that a claim involving contiguity, gores and overlaps (along the exterior boundaries or the encroachment of improvements) may render the property unmarketable and/or lead to costly litigation.   A title company has a duty to defend the property owner and therefore, they are unlikely to voluntarily provide coverage for these problems when they are discovered through a land survey.

By contrast, in the residential market, most California lenders do not require property surveys. In other states there is a "mortgage survey" market. On residential title insurance policies, the title companies write an exception to coverage for any matters that would have been disclosed by a proper land survey.   Nevertheless, with all properties (commercial and residential), title insurance coverage will endorse that a property has a clear chain of title and the title company (at least in theory) will defend against any other claims of ownership.  This is the

---

[4] Christopher L. Peterson, Written Testimony of, Hearing on: "*Foreclosed Justice: Causes and Effects of the Foreclosure Crisis*", United States House of Representatives, Committee on the Judiciary (December 2, 2010)
[5] *Id.*
[6] *Id.*

reason the title insurers were/are refusing to underwrite policies on foreclosures – MERS does not provide the necessary information for a chain of title.

**Question 1:**

> **If the boundaries between any two properties cannot be definitively located, how is that going to affect the value of the property or the development of the property**?

**Answer 1:**

A lender will not grant a loan on property that cannot be insured by a title company.  The current argument is the delays in foreclosure will hurt the economic recovery; however, the adverse effects of destroying land title will far exceed a comparatively short delay in foreclosures and may required litigation to clear future title.

**Question 2:**

> **How prevalent is the problem?   How many properties will be affected?**

**Answer 2:**

> **2 out of 5 (38%) of the loans in the sample set of 15,710 loans.**

Using Dataquick ([http://www.dataquick.com/](http://www.dataquick.com/)), the author requested sales transaction data for commercial properties sold between January 1st, 2005 and April 10th, 2009 setting a minimum sales price of $3M plus and sampling several California counties (Orange, Los Angeles, Riverside, San Bernardino, San Diego and Sacramento).

The 2006 results are as follows:

o   Total of 15,710 loans (in 2006) were examined.

o   Percentage of sequential conveyances - 38% (approximately 5,970 loans).

o   The minimum and maximum number of sequential conveyances in the counties sampled were a minimum of 30% in San Diego County and a maximum of 55% in Sacramento County (with Orange County, Los Angeles County, Riverside County and San Bernardino County falling within this 30% to 55% range).

o   In 1972, California (arguably very progressive in subdivision law) recognized sequential conveyances were a constant source of real property litigation.  California subsequently outlawed the use of legal descriptions to subdivide property after 1972.  In California, real property is required to be surveyed and mapped (platted) with few exceptions.  Even

so, 38% of the 2006 conveyances remain remnants of the pre-1972 litigation prone subdivision system.

o   The estimated number of properties (adjoining the affected 38%) exceeds 18,000 properties.  Assume 3 adjoining properties, one on each side and one in the back.  Now consider the number of foreclosures (projected at 13 million by 2012 [7]) and consider the true number of adjoining properties (a very large number).

The chain of title is needed to determine the junior and senior rights of any property.  The owner that wants to delineate a property line (possibly to build improvements) will require a land survey to examine the conveyance documents as well as the adjoining property owners conveyance documents.  In the event of a conflict in title elements, an unbroken chain of title resolves most problems without the need for complex litigation (quiet title action).

**Question 3:**

**Is there a public policy issue that could protect the public?**

**Answer 3:**

Yes.  MERS, service providers and lenders should not be allowed to circumvent the land title system by legalizing the MERS database (H.R. 3808) as a quasi recording system.

The law (by extension the courts) should not allow attorneys to file affidavits for lost ownership or land title documents without proof of established bona fide rights.  Most people have little understanding of the land title system.  Most people cannot be expected to understand land title rights and negotiate coverage with a sophisticated insurance provider that historically pays 5% in loss and loss adjustment claims. [8]

A recent conveyance of a foreclosed property, insured by Old Republic Title Company, had the following covenant attached to the grant deed which hints at the relationship between the note holder (presumably) and the title insurer:

> "Grantor covenants that it is seized and possessed of the land and has a right to convey it, and warrants the title against lawful claims of all persons claiming, by, through and under it, but not further otherwise."

What exactly does the title insurer cover, if not title?  The average consumer must work through the same chaotic system the American public has been told to rely on for mortgage modifications.  Of course, working through this system comes at considerable time and expense if a claim arises.

---

[7] L. Randall Wray, *Requiem for MERS (and Banks That Created the Frankenstein Monster),* Huffington Post (January 24, 2011)
[8] United States Government Accountability Office, GAO-07-401 (April 2007) pg. 9.

Ron Lieber of The New York Times accurately summed it up:

> "Title insurance companies would like you believe that they are the good guys standing behind you.  After all, you are the customer who owns the policy.
>
> In fact, many of the title insurance companies are more concerned about their real estate agents, lawyers and lenders who can steer business their way.  The title insurance companies are well aware that most people do not shop around for title insurance, even though it's possible to do so…While the title insurers are not supposed to kick back money directly to companies or brokers that send business their way, various government investigators [including the GAO] over the years have turned up all sorts of *cozy* dealings that make you shake your head in disgust.
>
> But since you have to buy the insurance if you need a mortgage, there is not much you can do except hold your nose."[9]

Iowa Attorney General Tom Miller is leading a 50-state AG investigation into major lenders…for signing foreclosure affidavits without reviewing documentation or having previous knowledge of a specific case (ROBO-Signer Scandal).  Miller believes a strong settlement would require banks to complete substantially more loan modifications, offer borrowers a principal reduction before allowing a foreclosure proceeding and include remedial action for foreclosed homeowners who have already lost their residence.[10]

**Question 4:**

> **What relief is planned for the neighboring property that doesn't have a mortgage loan but has still lost his senior rights established in a statutory race/notice sequence system upon the utilization of MERS.  What happens to this property owner who has lost the chain of title for the adjoining property?  How would that situation be addressed by a settlement?**

**Answer 4:**

Consider the fact that there are many property owners (adjoining foreclosed properties) losing their senior property rights without representation.   Conservatively, there are three

---

[9] Ron Lieber, *After Foreclosure, A Focus on Title Insurance*, The New York Times (October 8, 2010). http://www.nytimes.com/2010/10/09/your-money/mortgages/09money.html?_r=2&pagewanted=print
[10] Christine Ricciardi, *Iowa AG Miller to meet with consumer groups on robo-signing settlement*, Housingwire.com (January 25, 2011)

properties losing their rights and chain of title for each title lost in a sequential conveyance done through the MERS system (one property on each side and one behind the conveyed property). The banks are not set up to handle these types of questions or claims. Real property title is complex by nature and the consumers will be litigating their boundaries for years into the future. A settlement brokered by the Attorney's General would not have considered the title ramifications, especially those adjoining property owners. Those people that rushed in to invest in foreclosures may now have standing to put the loans back on the lenders, much the same way as the GSEs.

**Question 5:**

**How much liability is the title insurance industry looking at?**

**Answer 5:**

It depends – on whether we are talking about the residential or commercial market:

**A.    The Residential Market:**

For the answer regarding the residential market, please see the previous question and answer. In addition, in the future event the insurers refuse to underwrite foreclosures, title insurance industry exposure will be minimal in the residential market.

In the residential market, the question will be: Are the lenders willing to make loans without title insurance? It is unlikely. Historically, the title insurance industry writes exceptions to coverage for perceived risks. This practice means the homeowner must challenge a well financed title insurance company with a claims payment history of 5% or challenge their lender (think modified loans track record) to resolve their title claims. The concept of a modified loan is much easier to understand, by all parties, than complex land title issues. Imagine the nightmare of having to work through a lender seeking to answer land title questions, especially in the event the lender did not carry the mortgage, rather the neighbor's mortgage.

The media has mentioned that slowing foreclosures could hurt the U.S. economic recovery. However, there is no mention in these discussions about the loss in market value for a home/property that has a clouded title. To remove the cloud on title would require a quiet title court action adjudicating title to the property. This unappealing result will cause less interest from buyers and, consequently, a lower market value. Why would anyone buy a property with a material defect if the property across the street has clear title? Without clear title there is a question as to whether or the purchaser will be able to re-sell the property at a later date.

**B.    The Commercial Market:**

In the commercial market the answer is A LOT. The lender's attorneys negotiate insurance coverage and specific endorsements (extended coverage policies). Most lenders

require a land title survey.  If this survey identifies potential adverse claims on title, the lender's counsel will request specific endorsements and/or special riders to the title insurance policy.  For reasons beyond the scope of this paper, neither the title insurance industry or the lender's counsel are likely to have the professional background to identify alleged land surveying fraud.  It is equally unlikely that either party would suspect that a licensed surveyor might not automatically examine the relationship of the property to its adjoining properties or that this same surveyor might be violating the California Business and Professions Codes regulating the practice of surveying.  As evidenced by John C. Murray, Vice President and Special Counsel for First American Title Insurance Company:

> "If a survey is in fact submitted to the title insurer, it generally will take specific exception to the items shown on the survey.  If the title insurer takes specific exceptions for items shown on the survey, but misses a matter that should have been excepted and does not show it as a specific exception (such as an encroachment), the title insurer could incur liability under the "unmarketability of title" coverage provision if the buyer repudiates the contract because it has discovered the defect and refuses to close the transaction.  An unmarketability claim also may arise where there are survey that show different descriptions of property to be insured.
>
> If the surveyor made an error on the survey, e.g. by failing to disclose an existing encroachment or easement, and the title company becomes obligated to pay a claim to the insured party because of such an error (as happened in the *Dahlman* case, *supra*), the title company would have a claim back against the surveyor . . . ´ [11]

In 2007, I brought this problem to the attention of a one of the biggest title insurance companies. I was told that I was not the "sheriff" and that their underwriters have the situation handled.  The fact I was concerned about this title company's interests and the interests of the American public was lost on their general counsel.


**Question 6:**

> **Historically, the title insurance industry has paid 5% in claims (loss and loss adjustment), recently they have seen an uptick in claims. Why?**

**Answer 6:**

According to a Senior National Commercial Underwriter, the uptick in claims is "basically it's due to Mechanics Liens claims/coverage from insuring "broken priority" for

---

[11] John C. Murray, *Is An Encroachment Onto Adjoining Property An Encumbrance For Title Insurance Purposes*? (2006)

lenders over the last 3+ years or so…".  When asked if the claims rates have stabilized "Over the past few years, yes, but at a much higher rate than 5%". (citation removed).  A broken priority is a loss of order between lenders and the secondary mechanics lien process.  For example, the first note holder loses priority to a second note holder or a mechanics lien.

**Question 7:**

> **The news has been focused on the residential foreclosures, the residential mortgage backed securities and the effects of MERS thereof.  Do the same problems exist in the commercial mortgage backed securities?**

**Answer 7:**

According to Jon Prior of Housingwire.com:

> "Of the $22.5 billion in commercial mortgage-backed securities loans set to mature in 2011, roughly 30% do not pass the Fitch Ratings refinance test, the credit rating agency said Friday [01-21-2011]."

The owners' inability to refinance commercial properties will result in defaults and ultimately foreclosures.  In turn, this will result in the scrutiny of the particular property's documentation.  The impact of MERS on the CMBS market has not been widely reported.  According to data from New York based research and analytics firm Trepp LLC, the percentage of loans held in U.S. commercial mortgage-backed securities that were 30 or more days delinquent, in foreclosure, or REO increased by 35 basis points in November, 2010 to 8.93%, putting the value of delinquent loans at $60.3 billion.  Presumably, many more are on the way.

**Question 8:**

> **Referring to the chain of title issues, does this affect the securitization or secondary market?**

**Answer 8:**

Yes.  There may be a collateral debt obligation without any collateral.  In a worse case scenario, the note has been separated from the title (mortgage or trust deed) via MERS, the note holder is owed the balance established, but unless the title is held by the same entity there may not be a valid claim to the property (collateral).  Nemo dat quod non habet, literally meaning "no one [can] give what he does not have."  This legal rule, sometimes called the nemo dat rule, states that the purchase of a possession from someone who has no ownership right to the

possession, also denies the purchaser any ownership title.  Recent court cases have upheld this theory.[12]

Technically, the banks that have successfully foreclosed on property may have, in turn, resold the property, while not being able to prove that they ever had ownership of the property. This clouds the property's title and also breaks the property's chain of title.   This broken chain of title has obscured or lost the property rights that were established by historical race/notice statutes and thereby the court to determine property rights.

**Question 9:**

**What is the (best) counter argument presented?**

**Answer 9:**

The White Paper, *Transfer and Assignment of Residential Mortgage Loans in the Secondary Mortgage Market* (November 16, 2010), prepared by the Tom Deutsch of the American Securitization Forum, presents a counter argument. The thrust of this White Paper references the Uniform Commercial Code's premise that "the mortgage [title] follows the note [loan]."[13]  Deutsch argues that the fact the note was physically (or digitally) separated from the mortgage does not remove the standing of the note holder to foreclose.  Deutsch argues that the note is proof of title.  Nevertheless, since the White Paper referenced was written, there have been court rulings contrary to Deutsch's arguments.[14]  Furthermore, even as Deutsch's argument has some value, this argument does not fix the problem of a lost chain of title and all other problems addressed in this Addendum and the previous White Paper remain valid.

**Question 10:**

**Why wasn't this problem more prevalent in the past?**

**Answer 10:**

Prior to the practice of securitizing mortgage loans and the advent of MERS, mortgage loans were whole loans made and held by community lenders.  Furthermore, the practices of securitizing mortgage loans would have had less effect but for the staggering number of foreclosures (due in part, to lowered lending standards). Ultimately, Congress has accommodated lenders' poor choices and bad behavior with well publicized bailouts. The MERS issue and the

---

[12] See *U.S. Bank National Ass'n v. Ibanez* (January 7, 2011) 458 Mass. 637, 2011 Mass. LEXIS 5; *In re Agard* (United States Bankruptcy Court, Eastern District of New York, February 10, 2011) Case No. 8-10-77338, Doc. 41. http://findsenlaw.files.wordpress.com/2011/02/ny-bk-in-re-agard-feb-2011.pdf

[13] Tom Deutsch, *White Paper – Transfer and Assignment of Residential Mortgage Loans In the Secondary Mortgage Market* (November 16, 2010).

[14] See *U.S. Bank National Ass'n v..Ibanez* (January 7, 2011) 458 Mass 637, 2011 Mass. LEXIS 5; *In re Agard* (United States Bankruptcy Court, Eastern District of New York, February 10, 2011) Case No. 8-10-77338, Doc. 41. http://findsenlaw.files.wordpress.com/2011/02/ny-bk-in-re-agard-feb-2011.pdf

destruction of land title will affect even those without a mortgage.  Lenders, servicers, ALTA, MBA and others will mobilize their lobbies to minimize the MERS problem.

A search of the Online Grantor/Grantee Index on the Orange County, California Recorder's website lists 146,644 recorded documents involving MERS between January 1, 2010 and December 31, 2010.  From this sampling, it is likely that Los Angeles County's utilization would be more than 500,000 documents involving MERS (Los Angeles does not report this data online).  In other California counties, utilization was as follows:[15]

- Alameda County: 46,821
- Butte County: 4,424
- El Dorado County: Over 500 *(Search is limited to 500)*
- Lake County: Over 150 *(Search is limited to 150)*
- Marin County: Over 160 *(Search is limited to 160)*
- Merced County: 460 *(in January 2011to date)*
- Monterey County: 740 *(in January 2011date)*
- Napa County: 5,865
- Orange County: 146,644
- Placer County: Over 10,000 *(Search is limited to 10,000)*
- Riverside County: Over 3,000 *(Search is limited to 3,000)*
- San Joaquin County: 34,882
- San Diego County: 139,734
- San Mateo County: *Exceeded Maximum Search Results*
- Santa Barbara County: 13,074
- Shasta County: 3,684
- Sonoma County: 13,235
- Sutter County: 3,033
- Tehama County: 1,476
- Tulare County: 7,839
- Ventura County: Over 500 *(Search is limited to 500)*
- Yuba County: Over 200 *(Search is limited to 200)*

Note, because foreclosures halted during the last two months of 2010 this data is essentially for 10 months of foreclosures.

---

[15] Counties not included: Alpine, Amador, Calaveras, Colusa, Contra Costa, Del Norte, Fresno, Glenn, Humboldt, Imperial, Kern, Inyo, Kings, Lassen, Los Angeles, Madera, Mariposa, Mendocino, Modoc, Mono, Nevada, Plumas, Sacramento, San Benito, San Bernardino, San Francisco, San Luis Obispo, Santa Clara, Santa Cruz, Sierra, Siskiyou, Solano, Stanislaus, Trinity, Tuolumne, Yolo

**Question 11:**

   **Is there an example of MERS losing the chain of title for a property
   and the boundaries of that property being litigated?**

**Answer 11:**

   To date, we are not aware of any such cases, however, it is very early in the process.  The
real question is whether or not the chain has been broken.  The answer, according to multiple
sources is YES.  These are sleeping liabilities.  They exist, yet, until the owner is in need of
locating the property lines, they are hidden liabilities that can cost hundreds of thousands of
dollars when discovered and contested in court.  Uncontested, these problems will cost tens of
thousands of dollars to remove the cloud on title (See **Exhibit A**).  When discovered, the owner
will probably have to resort to litigation in a quiet title action. Furthermore, as demonstrated by
the title companies' failure to pay claims and defend, it is equally likely that the owner's title
insurance company will deny coverage.  In the event of litigation, the property will have a lis
pendens filed providing notice to any future purchasers.   This notice further devalues the
property in question.  Removing the lis pendens is also costly.  This is a terrible situation for the
homeowner.

**Question 12:**

   **Are there foreseeable issues in the commercial property loans and/or
   the CMBS market that will result in claims similar to those presented
   by MERS?**    *See also question 3 above.*

**Answer 12:**

   Yes.  There is more similarly to the reps and warranties violations resulting in put backs
to the lenders.   There will be an American Land Title Association ("ALTA") land survey in
many of the commercial property loan documents, The ALTA survey is the basis for the title
insurance policy and is a requirement for most lenders.  Lenders need additional assurances on
the title of the property as well the existence and locations improvements on high value
commercial properties.  Lenders do not want to incur an owner default because of a  title claim,
(such as marketable title claim). [16]  "Fraudulent" land title surveys (or land title surveys that do

---

[16] A property may be deemed unmarketable after the flaws in the ALTA survey are discovered.  In fact, no "adverse claimant"
need be present for a previous buyer to raise an unmarketability claim under their title insurance policy.  The possibility of a
"cloud" on title is enough to trigger title insurance coverage through their insurer.  The insured buyer may incur a title defect
rendering their property unmarketable when they go to sell or mortgage their property.  This may be the first time the insured
buyer discovers their property has a title defect – a defect that was never disclosed or discovered when their ALTA survey and

not meet California statutory requirements) are common place in California. [17]   The relationship between the land surveyor and the lender is similar to that of the investor and the third party auditors of a publicly traded company.   The lenders and the title insurance company base their policy negotiations on the land title survey.

As an example:

The defendants (surveyors and/or title companies) can be expected to claim privity with the party they contracted with, however, this may only be applicable in the negligent performance of a contract.   The parties that were not part of the contract may be charged with negligent misrepresentation, because plaintiffs may allege defendants failed to exercise reasonable care when acting in the course of their professions, supplied false information for the guidance of others in a business transaction, and plaintiffs justifiably relied upon that information to their detriment.   Minimally, the property's owner, not having been part of the contract, may be required to expend attorney's fees to quiet title to his property.   "One who through the tort of another has been required to act in the protection of his interest by bringing or defending an action against a third person may be entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action"[18]

Now imagine these surveys were not completed by individual mom and pop land surveying shops, but rather there is a title insurance company that is brokering and carrying the

---

title search were conducted prior to the buyer's initial purchase of the property.   Once discovered, the buyer can file a claim against their title insurer.

What constitutes a marketable title has been widely defined by the California courts. "Unmarketability" claims may be brought by an insured in many contexts, including:

1.  An unreleased mortgage in the chain of title;
2.  A missing signature in a document in the chain of title;
3.  A transfer from a decedent without the proper probate proceedings or a right of survivorship;
4.  A "wild" deed or mortgage; an apparent violation of restrictions or covenants affecting the property;
5.  An encroachment, easement, or disputed boundary location;
6.  A forgery or questionable signature on a document in the chain of title;
7.  A deed recorded long after the death of the grantor;
8.  A vesting in reliance on an off-record, defective, or illegible power of attorney;
9.  A tax or judgment lien against a name matching a grantor's name;
10.  Incorrect parcel descriptions;
11.  A jurisdictional or other defect in a court action or proceeding (including defective notice or service of process) from which title to the insured property is derived;
12.  Unresolved conflicts between two surveys;
13.  A conveyance while a bankruptcy stay remains in effect; and
14.  Ambiguous documents in the chain of title.
15.  A right of reverter in the chain of title.

Murray, John C., Vice President-Special Counsel, First American Title Insurance Company, *Title Insurance Coverage for "Unmarketability of the Title"* (2008).

[17] Use of the word "fraud" is meant in its everyday use. Legal cause of actions encompassing fraud must be proven by specific elements in a court of law (including a determination of intent).

[18] *Pullman Standard, Inc. v. ABEX Corp.* (Tenn. 1985) 693 S.W. 2d 336.

contracts for the ALTA surveys.   Alternatively, imagine that there were national service providers brokering these ALTA surveys.

**Recommended Reading:**

Research is readily available on the topics included in this paper.  Regarding MERS and its effects, see works of Christopher L. Peterson of the University of Utah.  As to the function of land title (particularly marketable title, mezzanine financing, title insurance converges and attorney malpractice in real estate transactions) see the works of John C. Murray of First American Title Insurance Company, Chicago.

**In Closing:**

Land ownership, land title, land rights and land resources are the backbone of this country, both literally and psychologically.  The alteration of 400 years of land title records in order to accommodate the last 15 years of securitization (at the cost of ownership rights) would be inexcusable.

**End Report**

# EXHIBIT A

## OWNBEY PROPERTY CASE

### *The Problem*

Albert Walter Ownbey ("Ownbey") bought a one acre parcel of land in 1973 ("Ownbey Property").   Daesoo Stanley Ji ("Ji") bought one half acre of land in 2007 that adjoined the Ownbey property ("Ji Property"). Both properties have valid deed descriptions. Nevertheless, there was a 9 foot overlap existing between the two properties. Both properties are shown on Record of Survey book 77, page 5, filed on November 17, 1964 in the Orange County Recorder's Office showing the 9 foot overlap as being part of the Ownbey Property.   When purchasing the Ji Property, Ji received a title insurance policy issued by Fidelity National Title Insurance Company ("Fidelity") and referenced as Title Report Policy No. 27-131-03-410085.

After Ji did a custom remodel on the Ji Property in 2009, Ji decided to sell the Ji Property with an asking price of $1,490,000. Ownbey became concerned that some of remodeled Ji Property (specifically a retaining wall and stairs) might encroach on the Ownbey Property. Ownbey hired D. Woolley & Associates, Land Surveying and Mapping ("D. Woolley") to complete a boundary survey. During the survey process, D. Woolley discovered a 9 foot overlap between the Ji and Ownbey properties of approximately 1,506 square feet.  Mr. Ownbey is 83 years old, owns the Ownbey Property free and clear with plans to leave his Property to his children with the idea that they might want to further subdivide the Ownbey Property in the future.  In the neighborhood where the Ji and Ownbey Properties are located, the minimum lot size is one half acre. The 9 foot overlap jeopardizes the ability to subdivide the Ownbey Property lot and greatly diminishes the Ownbey Property's value.

When the problem with the two properties became known, Ji faced losing prospective buyers in a down real estate market.  Ji filed a claim with Fidelity and was assigned Jennifer Reeves, Claims Administrator from the Omaha Regional Claims Center to handle his case. Fidelity acknowledged an overlapping problem might exists, but denied Ji's claim because there was a written exception in the title insurance policy excluding coverage for the following:

> "In addition to the exclusions, you are not insured against loss, costs, attorney's fees and expenses resulting from: The effect of a record of survey recorded November 17, 1964 as book 77, page 5 of Records of Survey. As the boundary dispute forming the basis of your claim was shown on the 1964 survey which was a specific exception from coverage under the policy, Fidelity respectfully denies coverage for your claim."

Ji and Ownbey required a chain of title review to determine senior/junior rights. Fidelity failed to find the document showing where the 9 feet in question was transferred from the Ownbey Propery to the Ji Property in the title report policy for the Ji Property. In April 2009, D. Woolley performed a chain of title search at the Orange County Recorder's Office; however, it

was also unable to find the document transferring the 9 feet from the Ownbey Property to the Ji Property.

In June of 2009 D. Woolley ordered a preliminary title report from Lawyer's Title Insurance Corporation for the Ji and Ownbey Properties.  On July 1, 2009, Preliminary Title Report File No. 11687603-10 also could not find the document transferring the 9 feet from the Ownbey Property to the Ji Property.  Lawyer's Title Insurance Corporation assured D. Woolley that all recorded documents were provided to them. In total, three independent chain of title searches that were performed all indicated that there was a gap in the chain of title from April 22, 1965 and May 28, 1968.

In this case, the chain of title was lost due to foreclosure through Monarch Savings and Loan Association ("Monarch").  Monarch was not in the chain of title, therefore, Monarch did not own the 9 feet to grant.  Instead, Monarch attempted to convey the 9 feet and adjust the lot line without a properly recorded grant deed.  Furthermore, no other document appears in the chain of title transferring the 9 feet in question from the Ownbey Property to the Ji Property.

### *The Solution*

To solve the problem between the Ji and Ownbey Properties pursuant to California statues, a binding Boundary Line Agreement a Record of Survey must be filed in Orange County Recorder's Office.  In preparing the Boundary Line Agreement, the drafter(s) must carefully word the Agreement so as to be binding on all successors in interest.  Once the Boundary Line Agreement is finalized, modified Deeds of Trust for both the Ownbey and Ji Properties must be filed to protect the interests of all future parties.

In this case, the cost of the chain of title, field survey, Record of Survey and Boundary Line Agreement was $11,000 (at a reduced rate due to prior survey work on the Ownbey Property). The two parties split the cost. Additionally, Ji and Ownbey paid a property attorney $1500 to review and revise the required documents.  This process took approximately 18 months to complete.  Even though expensive, this solution was much cheaper than the parties resorting to litigation (each paying their own attorneys) to resolve the problem.

# EXHIBIT B

## CIVIL CODE, SECTION 1066

1066. Grants are to be interpreted in like manner with contracts in general, except so far as is otherwise provide in this Article.

(See Civil Code Section 1635-1663 for interpretation of contracts [grants])

## CIVIL CODE, SECTION 1635-1663

1635.  All contracts, whether public or private, are to be interpreted by the same rules, except as otherwise provided by this Code.

1636.  A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.

1637.  For the purpose of ascertaining the intention of the parties to a contract, if otherwise doubtful, the rules given in this Chapter are to be applied.

1638.  The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.

1639.  When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this Title.

1640.  When, through fraud, mistake, or accident, a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded.

1641.  The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.

1642.  Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together.

1643.  A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties.

1644.  The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed.

1645.  Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense.

1646.  A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made.

1646.5.  Notwithstanding Section 1646, the parties to any contract, agreement, or undertaking, contingent or otherwise, relating to a transaction involving in the aggregate not less than two hundred fifty thousand dollars ($250,000), including a transaction otherwise covered by subdivision (a) of Section 1301 of the Commercial Code,
may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not the contract, agreement, or undertaking or transaction bears a reasonable relation to this state. This section does not apply to any contract, agreement, or undertaking (a) for labor or personal services, (b) relating to any transaction primarily for personal, family, or household purposes, or (c) to the extent provided to the contrary in subdivision (c) of Section 1301 of the Commercial Code.

   This section applies to contracts, agreements, and undertakings entered into before, on, or after its effective date; it shall be fully retroactive. Contracts, agreements, and undertakings selecting California law entered into before the effective date of this section
shall be valid, enforceable, and effective as if this section had been in effect on the date they were entered into; and actions and proceedings commencing in a court of this state before the effective date of this section may be maintained as if this section were in
effect on the date they were commenced.

1647.  A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates.

1648.  However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract.

1649.  If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.

1650.  Particular clauses of a contract are subordinate to its general intent.

1651.  Where a contract is partly written and partly printed, or where part of it is written or printed under the special directions of the parties, and with a special view to their intention, and the remainder is copied from a form originally prepared without special
reference to the particular parties and the particular contract in question, the written parts control the printed parts, and the parts which are purely original control those which are copied from a form. And if the two are absolutely repugnant, the latter must be so far disregarded.

1652.  Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract.

1653.  Words in a contract which are wholly inconsistent with its nature, or with the main intention of the parties, are to be rejected.

1654.  In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.

1655.  Stipulations which are necessary to make a contract reasonable, or conformable to usage, are implied, in respect to matters concerning which the contract manifests no contrary intention.

1656.  All things that in law or usage are considered as incidental to a contract, or as necessary to carry it into effect, are implied therefrom, unless some of them are expressly mentioned therein, when all other things of the same class are deemed to be excluded.

# <u>EXHIBIT C</u>

 # Fidelity National Title Company

## PRELIMINARY REPORT

*In response to the application for a policy of title insurance referenced herein, **Fidelity National Title Company** hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a policy or policies of title insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception herein or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations or Conditions of said policy forms.*

*The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Attachment One. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Attachment One. Copies of the policy forms should be read. They are available from the office which issued this report.*

*This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.*

*The policy(s) of title insurance to be issued hereunder will be policy(s) of Fidelity National Title Insurance Company, a California corporation.*

***Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Attachment One of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.***

***It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects and encumbrances affecting title to the land.***

Countersigned

**Fidelity National Title Company**

BY

SEAL

ATTEST

President

Secretary

**\*SAMPLE BOILER PLATE LANGUAGE**

CLTA Preliminary Report Form - Modified (11/17/06)

## ATTACHMENT ONE

### AMERICAN LAND TITLE ASSOCIATION
### RESIDENTIAL TITLE INSURANCE POLICY (6-1-87) EXCLUSIONS

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes building and zoning ordinances and also laws and regulations concerning:
   - land use
   - improvements on the land
   - land division
   - environmental protection

   This exclusion does not apply to violations or the enforcement of these matters which appear in the public records at policy date.

   This exclusion does not limit the zoning coverage described in Items 12 and 13 of Covered Title Risks.

2. The right to take the land by condemning it, unless:
   - a notice of exercising the right appears in the public records on the Policy Date
   - the taking happened prior to the Policy Date and is binding on you if you bought the land without knowledge of the taking

3. Title Risks:
   - that are created, allowed, or agreed to by you
   - that are known to you, but not to us, on the Policy Date-unless they appeared in the public records
   - that result in no loss to you
   - that first affect your title after the Policy Date - this does not limit the labor and material lien coverage in Item 8 of Covered Title Risks

4. Failure to pay value for your title.

5. Lack of a right:
   - to any land outside the area specifically described and referred to in Item 3 of Schedule A
   or
   - in streets, alleys, or waterways that touch your land

   This exclusion does not limit the access coverage in Item 5 of Covered Title Risks.

In addition to the Exclusions, you are not insured against loss, costs, attorneys' fees, and the expenses resulting from:

1. Any rights, interests, or claims of parties in possession of the land not shown by the public records.

2. Any easements or liens not shown by the public records. This does not limit the lien coverage in Item 8 of Covered Title Risks.

3. Any facts about the land which a correct survey would disclose and which are not shown by the public records. This does not limit the forced removal coverage in Item 12 of Covered Title Risks.

4. Any water rights or claims or title to water in or under the land, whether or not shown by the public records.

Attachment One (01/01/09)

**ATTACHMENT ONE**
**(CONTINUED)**

**CALIFORNIA LAND TITLE ASSOCIATION STANDARD COVERAGE POLICY - 1990**
**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims, or other matters:
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

**SCHEDULE B, PART I**
**EXCEPTIONS FROM COVERAGE**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

**PART I**

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records. Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the public records.

**ATTACHMENT ONE**
**(CONTINUED)**

### FORMERLY AMERICAN LAND TITLE ASSOCIATION LOAN POLICY (10-17-92)
### WITH A.L.T.A. ENDORSEMENT-FORM 1 COVERAGE
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims, or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material or to the extent

insurance is afforded herein as to assessments for street improvements under construction or completed at Date of Policy); or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.
7. Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (i) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or
   (ii) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination; or
   (iii) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:
      (a) to timely record the instrument of transfer; or
      (b) of such recordation to impart notice to a purchaser for value or a judgement or lien creditor.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.
In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records. Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

**ATTACHMENT ONE
(CONTINUED)**

**2006 AMERICAN LAND TITLE ASSOCIATION LOAN POLICY (06-17-06)
EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (i) the occupancy, use, or enjoyment of the Land;
    (ii) the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv) environmental protection;

    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims, or other matters

    (a) created, suffered, assumed, or agreed to by the Insured Claimant;

    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

    (c) resulting in no loss or damage to the Insured Claimant;

    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or

    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is

    (a) a fraudulent conveyance or fraudulent transfer, or
    (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.

7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.
In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

**EXCEPTIONS FROM COVERAGE**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

## ATTACHMENT ONE
### (CONTINUED)

### FORMERLY AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY (10-17-92)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims, or other matters:

   (a) created, suffered, assumed or agreed to by the insured claimant;

   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

   (c) resulting in no loss or damage to the insured claimant;

   (d) attaching or created subsequent to Date of Policy, or

   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.

4. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:

   (i) the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer; or

   (ii) the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure:

   (a) to timely record the instrument of transfer; or

   (b) of such recordation to impart notice to a purchaser for value or a judgement or lien creditor.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.
In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records. Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

## ATTACHMENT ONE
### (CONTINUED)

## 2006 AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY (06-17-06)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;

   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
   (a) a fraudulent conveyance or fraudulent transfer; or
   (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.
In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

**ATTACHMENT ONE**
**(CONTINUED)**

**CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (10-22-03)**
**ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (10-22-03)**
**EXCLUSIONS**

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes ordinances, laws and regulations concerning:
   a. building
   b. zoning
   c. Land use
   d. improvements on Land
   e. Land division
   f. environmental protection

   This Exclusion does not apply to violations or the enforcement of these matters if notice of the violation or enforcement appears in the Public Records at the Policy Date.

   This Exclusion does not limit the coverage described in Covered Risk 14, 15, 16, 17 or 24.

2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at the Policy Date.

3. The right to take the Land by condemning it, unless:
   a. notice of exercising the right appears in the Public Records at the Policy Date; or

   b. the taking happened before the Policy Date and is binding on You if You bought the Land without Knowing of the taking.

4. Risks:
   a. that are created, allowed, or agreed to by You;
   b. that are Known to You at the Policy Date, but not to Us, unless they appear in the Public Records at the Policy Date;
   c. that result in no loss to You; or
   d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.d, 22, 23, 24 or 25.

5. Failure to pay value for Your Title.

6. Lack of a right:
   a. to any Land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   b. in streets, alleys, or waterways that touch the Land.

   This Exclusion does not limit the coverage described in Covered Risk 11 or 18.

**LIMITATIONS ON COVERED RISKS**

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:

- For Covered Risk 14, 15, 16 and 18, Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

| | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 14: | 1.00% of Policy Amount or $ 2,500.00 (Whichever is less) | $ 10,000.00 |
| Covered Risk 15: | 1.00% of Policy Amount or $ 5,000.00 (Whichever is less) | $ 25,000.00 |
| Covered Risk 16: | 1.00% of Policy Amount or $ 5,000.00 (Whichever is less) | $ 25,000.00 |
| Covered Risk 18: | 1.00% of Policy Amount or $ 2,500.00 (Whichever is less) | $ 5,000.00 |

ATTACHMENT ONE
(CONTINUED)

ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (10/13/01)
EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a)  Any law, ordinance or governmental regulation (including but not limited to zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions or location of any improvements now or hereafter erected on the Land; (iii) a separation in ownership or a change in the dimensions or areas of the Land or any parcel of which the Land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 12, 13, 14, and 16 of this policy.
   (b)  Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 12, 13, 14, and 16 of this policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the Public Records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without Knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a)  created, suffered, assumed or agreed to by the Insured Claimant;
   (b)  not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c)  resulting in no loss damage to the Insured Claimant;

   (d)  attaching or created subsequent to Date of Policy (this paragraph does not limit the coverage provided under Covered Risks 8, 16, 18, 19, 20, 21, 22, 23, 24, 25 and 26); or
   (e)  resulting in loss or damage which would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of the Insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the Land is situated.
5. Invalidity or unenforceability of the lien of the Insured Mortgage, or claim thereof, which arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, except as provided in Covered Risk 27, or any consumer credit protection or truth in lending law.
6. Real property taxes or assessments of any governmental authority which become a lien on the Land subsequent to Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 7, 8(e) and 26.
7. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This exclusion does not limit the coverage provided in Covered Risk 8.
8. Lack of priority of the lien of the Insured Mortgage as to each and every advance made after Date of Policy, and all interest charged thereon, over liens, encumbrances and other matters affecting the title, the existence of which are Known to the Insured at:
   (a)  The time of the advance; or
   (b)  The time a modification is made to the terms of the Insured Mortgage which changes the rate of interest charged, if the rate of interest is greater as a result of the modification than it would have been before the modification. This exclusion does not limit the coverage provided in Covered Risk 8.
9. The failure of the residential structure, or any portion thereof to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at Date of Policy.

## ATTACHMENT ONE
### (CONTINUED)

### ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (01/01/08)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.

   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;

   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.
6. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.
8. The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.

## Notice

You may be entitled to receive a $20.00 discount on escrow services if you purchased, sold or refinanced residential property in California between May 19, 1995 and November 1, 2002. If you had more than one qualifying transaction, you may be entitled to multiple discounts.

If your previous transaction involved the same property that is the subject of your current transaction, you do not have to do anything; the Company will provide the discount, provided you are paying for escrow or title services in this transaction.

If your previous transaction involved property different from the property that is the subject of your current transaction, you must - prior to the close of the current transaction - inform the Company of the earlier transaction, provide the address of the property involved in the previous transaction, and the date or approximate date that the escrow closed to be eligible for the discount.

Unless you inform the Company of the prior transaction on property that is not the subject of this transaction, the Company has no obligation to conduct an investigation to determine if you qualify for a discount. If you provide the Company information concerning a prior transaction, the Company is required to determine if you qualify for a discount which is subject to other terms and conditions.

Effective through November 1, 2014

Effective Date: 5/1/2008

### Fidelity National Financial, Inc.
### Privacy Statement

Fidelity National Financial, Inc. and its subsidiaries ("FNF") respect the privacy and security of your non-public personal information ("Personal Information") and protecting your Personal Information is one of our top priorities. This Privacy Statement explains FNF's privacy practices, including how we use the Personal Information we receive from you and from other specified sources, and to whom it may be disclosed. FNF follows the privacy practices described in this Privacy Statement and, depending on the business performed, FNF companies may share information as described herein.

**Personal Information Collected**
We may collect Personal Information about you from the following sources:
- Information we receive from you on applications or other forms, such as your name, address, social security number, tax identification number, asset information, and income information;
- Information we receive from you through our Internet websites, such as your name, address, email address, Internet Protocol address, the website links you used to get to our websites, and your activity while using or reviewing our websites;
- Information about your transactions with or services performed by us, our affiliates, or others, such as information concerning your policy, premiums, payment history, information about your home or other real property, information from lenders and other third parties involved in such transaction, account balances, and credit card information; and
- Information we receive from consumer or other reporting agencies and publicly recorded documents.

**Disclosure of Personal Information**
We may provide your Personal Information (excluding information we receive from consumer or other credit reporting agencies) to various individuals and companies, as permitted by law, without obtaining your prior authorization. Such laws do not allow consumers to restrict these disclosures. Disclosures may include, without limitation, the following:

- To insurance agents, brokers, representatives, support organizations, or others to provide you with services you have requested, and to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure in connection with an insurance transaction;
- To third-party contractors or service providers for the purpose of determining your eligibility for an insurance benefit or payment and/or providing you with services you have requested;
- To an insurance regulatory authority, or a law enforcement or other governmental authority, in a civil action, in connection with a subpoena or a governmental investigation;
- To companies that perform marketing services on our behalf or to other financial institutions with which we have joint marketing agreements and/or
- To lenders, lien holders, judgment creditors, or other parties claiming an encumbrance or an interest in title whose claim or interest must be determined, settled, paid or released prior to a title or escrow closing.

We may also disclose your Personal Information to others when we believe, in good faith, that such disclosure is reasonably necessary to comply with the law or to protect the safety of our customers, employees, or property and/or to comply with a judicial proceeding, court order or legal process.

Effective Date: 5/1/2008

<u>Disclosure to Affiliated Companies</u> - We are permitted by law to share your name, address and facts about your transaction with other FNF companies, such as insurance companies, agents, and other real estate service providers to provide you with services you have requested, for marketing or product development research, or to market products or services to you. We do not, however, disclose information we collect from consumer or credit reporting agencies with our affiliates or others without your consent, in conformity with applicable law, unless such disclosure is otherwise permitted by law.

<u>Disclosure to Nonaffiliated Third Parties</u> - We do not disclose Personal Information about our customers or former customers to nonaffiliated third parties, except as outlined herein or as otherwise permitted by law.

**Confidentiality and Security of Personal Information**
We restrict access to Personal Information about you to those employees who need to know that information to provide products or services to you. We maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard Personal Information.

**Access To Personal Information/**
**Requests for Correction, Amendment, or Deletion of Personal Information**
As required by applicable law, we will afford you the right to access your Personal Information, under certain circumstances to find out to whom your Personal Information has been disclosed, and request correction or deletion of your Personal Information.  However, <u>FNF's current policy is to maintain customers' Personal Information for no less than your state's required record retention requirements for the purpose of handling future coverage claims</u>.

For your protection, <u>all requests made under this section must be in writing and must include your notarized signature to establish your identity</u>. Where permitted by law, we may charge a reasonable fee to cover the costs incurred in responding to such requests. Please send requests to:

<div align="center">

Chief Privacy Officer
Fidelity National Financial, Inc.
601 Riverside Avenue
Jacksonville, FL 32204

</div>

**Changes to this Privacy Statement**
This Privacy Statement may be amended from time to time consistent with applicable privacy laws. When we amend this Privacy Statement, we will post a notice of such changes on our website. The effective date of this Privacy Statement, as stated above, indicates the last time this Privacy Statement was revised or materially changed.

### Notice of Available Discounts

Pursuant to Section 2355.3 in Title 10 of the California Code of Regulations Fidelity National Financial, Inc. and its subsidiaries ("FNF") must deliver a notice of each discount available under our current rate filing along with the delivery of escrow instructions, a preliminary report or commitment. Please be aware that the provision of this notice does not constitute a waiver of the consumer's right to be charged the filed rate. As such, your transaction may not qualify for the below discounts.

You are encouraged to discuss the applicability of one or more of the below discounts with a Company representative. These discounts are generally described below; consult the rate manual for a full description of the terms, conditions and requirements for such discount. These discounts only apply to transactions involving services rendered by the FNF Family of Companies. This notice only applies to transactions involving property improved with a one-to-four family residential dwelling.

**FNF Underwritten Title Companies**
FNTC - Fidelity National Title Company
FNTCCA - Fidelity National Title Company of California

**FNF Underwriter**
FNTIC - Fidelity National Title Insurance Co.

**Available Discounts**
**CREDIT FOR PRELIMINARY REPORTS AND/OR COMMITMENTS ON SUBSEQUENT POLICIES (FNTIC)**
Where no major change in the title has occurred since the issuance of the original report or commitment, the order may be reopened within 12 months and all or a portion of the charge previously paid for the report or commitment may be credited on a subsequent policy charge within the following time period from the date of the report.

**FEE REDUCTION SETTLEMENT PROGRAM (FNTC, FNTCCA and FNTIC)**
Eligible customers shall receive a $20.00 reduction in their title and/or escrow fees charged by the Company for each eligible transaction in accordance with the terms of the Final Judgments entered in The People of the State of California.

**DISASTER LOANS (FNTIC)**
The charge for a Lender's Policy (Standard or Extended coverage) covering the financing or refinancing by an owner of record, within 24 months of the date of a declaration of a disaster area by the government of the United States or the State of California on any land located in said area, which was partially or totally destroyed in the disaster, will be 50% of the appropriate title insurance rate.

**CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS (FNTIC)**
On properties used as a church or for charitable purposes within the scope of the normal activities of such entities, provided said charge is normally the church's obligation the charge for an owner's policy shall be 50% to 70% of the appropriate title insurance rate, depending on the type of coverage selected. The charge for a lender's policy shall be 40% to 50% of the appropriate title insurance rate, depending on the type of coverage selected.

**SHORT TERM RATE (FNTIC)**
If there is an insured owner and an order for title insurance is placed within sixty (60) months following the effective date of any prior policy of any title insurer, the charge will be 80% of the appropriate title insurance rate.

**EMPLOYEE RATE (FNTC, FNTCCA and FNTIC)**
No charge shall be made to employees (including employees on approved retirement) of the Company or its underwritten, subsidiary or affiliated title companies for policies or escrow services in connection with financing, refinancing, sale or purchase of the employees' bona fide home property. Waiver of such charges is authorized only in connection with those costs which the employee would be obligated to pay, by established custom, as a party to the transaction.

# EXHIBIT D

## UNMARKETABLE AND MARKETABLE TITLE

The commercial insurance policies generated by title companies are called ALTA Owner's and Loan Policies. These title insurance policies provide "covered risk" for "unmarketable title". Unmarketable title is defined (in section 1(k) of the latest Owner's Policy and section 1(m) of the latest Loan Policy) as "title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the title or lender on the title to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring delivery of marketable title."

By contrast, marketable title is defined as:

> "such a title free from reasonable doubt, and such that a reasonably prudent person, with full knowledge of the facts and their legal bearings, willing and anxious to perform his contract, would, in the exercise of that prudence which business men ordinarily bring to bear upon such transactions, be willing to accept and ought to accept. Title must be so far free from defects as to enable the holder, not only to retain the land, but possess it in peace, and, if he wishes to sell it, to be reasonably sure that no flaw or doubt will arise to disturb its market value."

*Lick Mill Creek Apartments v. Chicago Title Insur. Co.* (1991) 231 Cal. App. 3d 1654, 1660-1661 (citing *Mertens v. Berendsen* (1931) 213 Cal. 111, 112).

Title insurance involves the issuance of an insurance policy promising that, if the state of the title is other than as represented on the face of the policy, and if the insured suffers loss as a result of the difference, the insurer will reimburse the insured for that loss and any related legal expenses, up to the face amount of the policy. *Id.* at 1658. See also Cal. Ins. Code § 12340.1. When a title insurance policy represents that a title search was made, it also implied represents that the defects, impediments and other matters mentioned in the policy and excluded from coverage are the only ones disclosed by a search of public records (or disclosed on a new proper survey commissioned at the time the policy is issued). To the average layman (who has paid for a title search made in connection with a policy of title insurance) the policy itself serves as the abstract of title. See *Banville v. Schmidt* (1974) 37 Cal. App. 3d 92, 100-108.

A property may be deemed unmarketable after the flaws in the ALTA survey are discovered. In fact, no "adverse claimant" need be present for a previous buyer to raise an unmarketability claim under their title insurance policy. The possibility of a "cloud" on title is enough to trigger title insurance coverage through their insurer. The insured may incur a title defect rendering their property unmarketable when they go to sell or

mortgage their property.  Once discovered, the buyer can file a claim against their title insurer.

What constitutes a marketable title has been widely defined by the California courts. "Unmarketability" claims may be brought by an insured in many contexts, including:

1.   An unreleased mortgage in the chain of title;
2.   A missing signature in a document in the chain of title;
3.   A transfer from a decedent without the proper probate proceedings or a right of survivorship;
4.   A "wild" deed or mortgage; an apparent violation of restrictions or covenants affecting the property;
5.   An encroachment, easement, or disputed boundary location;
6.   A forgery or questionable signature on a document in the chain of title;
7.   A deed recorded long after the death of the grantor;
8.   A vesting in reliance on an off-record, defective, or illegible power of attorney;
9.   A tax or judgment lien against a name matching a grantor's name;
10.  Incorrect parcel descriptions;
11.  A jurisdictional or other defect in a court action or proceeding (including defective notice or service of process) from which title to the insured property is derived;
12.  Unresolved conflicts between two surveys;
13.  A conveyance while a bankruptcy stay remains in effect; and
14.  Ambiguous documents in the chain of title.
15.  A right of reverter in the chain of title. [1]

---

[1] Murray, John C., Vice President-Special Counsel, First American Title Insurance Company, *Title Insurance Coverage for "Unmarketability of the Title"* (2008) [emphasis added where a land survey can affect marketable title].

# EXHIBIT E



DIAGRAM 1

IN THE EVENT PARCEL 3 LOST THEIR CHAIN OF TITLE DUE TO MERS, IT WOULD ADVERSELY AFFECT 7 ADJOINING PARCELS (SHOWN AS A-G).

THIS CLOUD OF TITLE WOULD MAKE THE BOUNDARIES OF A-G INDETERMINATE WITHOUT COMPLEX AND EXPENSIVE LITIGATION.  RESTATED, ONE LOST CHAIN OF TITLE AFFECTS 7 PARCEL, WHICH MAY NOT EVEN HAVE A TRUST DEED (MORTGAGE).

DISCLAIMER: THIS IS A RANDOM TAX ASSESSOR'S MAP.  THERE IS NO INDICATION OF ANY EXISTING TITLE ISSUES FOR THE PROPERTY SHOWN.



# EXHIBIT F

## PROBLEM A2
20 Points

## PROBLEM STATEMENT

Due to a conflict in record data, the title company refuses to insure your client's legal description.

Your client's deed contains the following description:

Beginning at the northwest corner of Lot 1; east along lot lines 120 feet; south to point on south line 100 feet east of southwest corner of Lot 1; west 100 feet to southwest corner; north to point of beginning.

The title history is as follows:

Owner A acquired lots 1, 2, and 3 in 1964.

In 1970, Owner A conveyed to Owner B by deed recorded in Book 123 of Official Records Page 45, Lot 3 and portion of Lot 2 described as: beginning at the southeast corner of Lot 2; west along the Lot line 50 feet; north to point on northerly line 30 feet west of the northeast corner of Lot 2; east to northeast corner of Lot 2; south to point of beginning.

In 1975, Owner A conveyed to Owner C (your client's predecessor in title) using the same description as your client's deed.

### Record of Survey of Lots 1, 2, & 3 of Pacific Subdivision
### Filed in Book 86 of Maps, Page 50, Records of XYZ County, CA



## PROBLEM REQUIREMENTS

1. Describe the procedure you would use to analyze the data required for providing a legal description of your client's property; this legal description must be acceptable to the title company.                                                                  6 Points

2. What interpretations of those data would you make to determine your client's parcel dimensions? Show the dimensions along the northerly and southerly lines of Lot 2.                                                                                          4 Points

3. Prepare the legal description of your client's parcel.                                    10 Points

## Grading Plan - Problem A2

Grader ID No. _____
Candidate ID No. _____

1. a. Historical analysis of deeds to determine senior rights.  **4 Points** _____

   b. Review data on record of survey for comparison of data with original subdivision map.  **2 Points** _____

2. a. "B" is the senior parcel; "C" only has what is left.  **2 Points** _____

   b. Establish lot corners by proportional measure. Set deed line from lot corners as established.

   $\dfrac{75}{225} \times 224.10$ = South line lot dimension
   = 74.70

   $\dfrac{75}{225} \times 223.74$ = North line lot dimension
   = 74.58   **2 Points** _____

'A'  STREET



Part 3a of Problem A2 must include the complete preamble.  **2 Points** _____

3a. Example of an Acceptable Legal Description

   All that certain real property situated in the County of XYZ, State of California, described as follows:

   That portion of Lots 1 and 2 of Pacific Subdivision filed in Book 86 of Maps, Page 50, Records of XYZ County, California, described as follows:

Part 3b must include the complete body of the legal description.  **8 Points** _____

3b. Beginning at the northwest corner of said Lot 1; thence N 89° 15' E along the northerly line of said Lots 1 and 2, a distance of 119.16 feet to the northwest corner of the land described in the Deed to "B" recorded in Book 123 of Official Records, Page 45, Records of XYZ County, California; thence southerly along the westerly line of said land to the southwest corner thereof, being a point on the southerly line of said Lot 2; thence S 89° 35' W 99.40 feet to the southwest corner of said Lot 1; thence N 1° 26' W 105 feet to the point of beginning.

**TOTAL: 20 Points** _____

Comments:

L.S.- A
1988
Page ( 1 )

## Problem A-2  -  Wt. 6.0 points



### PROBLEM STATEMENT

The above sketch shows the record dimensions of Lot 11, Tract 123.
The Lot was divided by deeds, numbered in the following order:

DEED # 1. July 3, 1945  "The West 100.00' of Lot 11 ".

DEED # 2. July 5, 1945  "The East 100.00' of the West 200.00' of Lot 11".

DEED # 3. July 6, 1945  "The East 100.00' of the West 300.00' of Lot 11".

DEED # 4. July 7, 1945  "The Northerly 75.00' of the East 100.00' of Lot 11".

### REQUIRED

* * * * * * * * *
ANSWER THE FOLLOWING FOUR MULTIPLE CHOICE QUESTIONS
NUMBERED 1 THRU 4 BASED ON THE INFORMATION ABOVE.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
CIRCLE ONE LETTER (a) THRU (d) INDICATING YOUR ANSWER
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

1. The best way to describe the remaining parcel is:

a) The Southerly 75.00-feet of the Easterly 100.00 feet of Lot 11, Tract 123.

b) The Easterly 100.00 feet of the Southerly 75.00 feet of Lot 11, Tract 123.

c) Lot 11, Tract 123, Except the Westerly 300.00 feet, also except the Northerly 75.00 feet.

d) A portion of Lot 11, Tract 123, bounded on the West by the Easterly line of the Westerly 300.00 feet and on the North by the Northerly line of the Southerly 75.00 feet.

(Sheet 1 of 3)

L.S.- A
1988
Page ( 2 )

Problem A-2 continued

2. The description for Deed #4:

a) Is adequate; No gaps or overlaps may occur as a result of a field survey.

b) Is an "exception description".

c) Should be an exception description.

d) Is invalid, no access is provided to the remaining parcel.

3. If Lot 11, Tract 123, truly measures 401.50 along the North and South lines, who has <u>title</u> to the excess ?

a) It would be proportioned among all the parcels since they were created simultaneously.

b) The owner of Deed #1 since he is senior in right.

c) The State since no taxes were paid.

d) The original owner, his heirs or assignees.

4. If Lot 11, Tract 123 were to be divided under today's regulations, which document would be required if all the lots are designated residential ?

a) Parcel Map

b) Final Map

c) Record of Survey

d) Certificate of compliance

(Sheet 2 of 3)

L.S.- A
1988
Page ( 3 )

Problem A-2 continued

PROBLEM STATEMENT

Assume Lot 11, Tract 123 was further subdivided into the
configuration shown in the sketch, by a resubdivision and
a map was filed in 1945 creating the five parcels shown.

REQUIRED

ANSWER THE FOLLOWING TWO MULTIPLE CHOICE QUESTIONS
NUMBERED 5 AND 6 GIVEN THE ADDITIONAL FOLLOWING INFORMATION
**************************************************************
CIRCLE ONE LETTER (a) THRU (e) INDICATING YOUR ANSWER
**************************************************************

5.  Which statement is most correct ?

a)  The first lot sold will have senior rights.

b)  The map created a simultaneous conveyance situation.

c)  In the event of an excess or deficiency in the length
    of the North and/or South lines of Lot 11, each of the
    Westerly three lots will get their full width based on
    their order of conveyance.

d)  All of the above.

e)  None of the above.


6.  All the lots in the new resubdivision were purchased by
    Mr. Bostwick in 1946. They were never developed.
    In 1987 his heirs sold the entire parcel to Mr. Nostorn
    who wants to merge all the lots and construct a 20 unit
    condominium project. The Local Agency has no merger
    ordinance.Pursuant to State law he must file which,
    if any, of the following documents ?

a)  Final Map

b)  Parcel Map

c)  Record of Survey

d)  Certificate of compliance

e)  None of the above


(Sheet 3 of 3)

requires a written contract for all attorney work estimated to cost the client more than $1000 (Bus & P C §6148), counsel can enter into a written attorney-client agreement that specifically is limited to research and evaluation of the client's case, and that provides that any litigation or other further work is to be the subject of a separate written attorney-client contract.

Before the completion of the consultation, counsel and client should have a definite idea about what further action, if any, counsel is to undertake. If, at the conclusion of the initial consultation, the client retains counsel to represent him or her in the dispute, the plan of action should include a review of potential insurance coverage (see §§10.18–10.23) and further factual investigation (see §§10.24–10.40) and legal research (see §§10.41–10.59 or §§10.60–10.70, as applicable).

## §10.11    E. Checklist: Dos and Don'ts in Boundary Location Disputes

___ Remind clients that boundary location disputes are usually expensive to litigate (a client will sometimes fight to the last dollar). See §§10.6, 10.9–10.10, 10.94.

___ Explain to client that he or she will be charged for every minute of attorney services, including all client communications, whether by phone, letter, or e-mail. See §10.9.

___ Review applicable insurance policies and consider retaining insurance counsel; give notices of claim and tender defense of suit when appropriate. See §§10.8, 10.18–10.23, 10.90.

___ When the situation calls for it, consider early retention of experts, especially a surveyor. See §§10.6, 10.26–10.31, 10.78.

___ Research local ordinances that might apply to the disputed issues. See §§10.12–10.17.

___ Review title documents, interview witnesses, and check other evidence of boundary location. See §§10.32–10.40.

___ Consider interviewing predecessor owners of client's property and adjoining properties and neighbors not involved in the dispute. See §§10.36–10.38, 10.82.

___ Get photos; check with historical societies, governmental entities, and old families in the community (e.g., aerial photos taken several decades ago can help to establish location

of monuments that were later removed but are essential to a survey). See §§10.34–10.40.

___ Boundary issues are frequently not simple; be aware that some clients think they know the law better than counsel. See §10.7.

___ Establish from the beginning who is in charge of the case and discourage the client from speaking with other parties if the client is emotionally overwrought. See §§10.7, 10.9, 10.89–10.92.

___ Discuss all potential settlement options with client before filing suit. See §§10.10, 10.83–10.92.

___ Do not enter an appearance in any boundary litigation unless counsel is confident about handling both the emotional and the legal issues. See §§10.2–10.10.

___ Withdraw when any client insists he or she knows the law better than counsel. See §§10.7, 10.9.

___ Engage another expert if any expert, *e.g.*, surveyor or engineer, insists he or she knows the law better than counsel. But if the expert has legal authority or knows of a case on point, read it. On experts, see §§10.26–10.31, 10.78.

___ After reviewing all pertinent information, walk the property separately with the surveyor and the client and understand why each one believes the boundary line is a certain location. See §§10.25–10.28, 10.79.

___ Walk the property again with the client after the survey work is done and explain what was done, what was found, and what it means with respect to the boundary location.

___ Consider withdrawing if the client disagrees with counsel's or surveyor's assessment and wants to place the boundary in another location.

___ If there is continued doubt about the boundary location, research, read, and review again; usually the answer is buried somewhere.

___ If enormous doubt persists on the location or validity of the boundary, seriously consider not taking the case or withdrawing from it.

## §10.12    III. RESEARCHING LOCAL ORDINANCES

Because many aspects of land use are subject to local regulation,

# EXHIBIT H

## Sequential and Simultaneous Conveyances

### Sequential Conveyance:

"When a portion of a tract of land is sold, two or more parcels are created, a new parcel and the remainder of the parent parcel.  Because the new parcel must receive all of the land described, it is called the senior deed, and the remainder, at the time of conveyance, becomes the junior deed.  Sequential conveyances are those written deeds in which junior and senior rights exist between two adjoining parcels.  In general, sequential conveyances came into being because of a lapse of time between successive conveyance instruments.  For example, the state of Virginia granted a patent for a parcel of land to Jones, and at a later date granted an adjoining patent to Smith.  If the there happens to be an overlap of Smith's parcel on Jones's parcel, the party first in time (Jones, the senior deed) receives all that is described in the patent, and the adjoiner or second conveyance in time (Smith, the junior deed) receives the remainder.  If a gap exists, the portion, in theory, belongs to the state"[1].

Because of the numerous conflicts in deed rights established by sequential conveyances and subsequent litigation, California no longer allowed the division of property by sequential deeds after 1972.  Even with the ban being nearly 40 years ago, there are several million parcels with such descriptions.  An average of 38% of the commercial real estate conveyances in, minimum purchase price of $3 million, in the six California counties sampled has such descriptions.  The chain of title protects the rights of those "first in deed and last in will".

### Simultaneous Conveyances:

"When several parcels of land are created at the same moment in time, such as lots in a subdivision, several parcels in a will, or sections in a township, all parcels have equal legal standing; they were all created at the moment of filing the subdivision map, at the moment of death of the testator, or in the case of a U.S. township, at the time the plat was approved.  Sequential rights (senior rights) to lots in a filed subdivision rarely exist.  Usually, each party is entitled to his or her proporation of any excess or deficiency discovered.  However, sequential rights may exist between separate subdivisions.

In a resurvey of a deed, if no significant error of closure exists and all monuments fall in their measure positions, the resurvey merely amounts to replacing old monuments or setting new monuments…However, when measurements between original monument positions do not agree with those called for in the conveyance or when there is a significant error of closure, correcting these discrepancies becomes a problem.  The treatment of the discrepancy varies depending on whether the conveyance is sequential or simultaneous"[2].

---

[1] Brown, Curtis M., Walter G. Robillard, Donald A. Wilson, Brown's *Boundary Control and Legal Principles* (5th ed. 2003) § 11.2, pg. 301.
[2] *Id.* pg. 301-302

# CURRICULUM VITAE

## David E. Woolley

Professional Land Surveyor
D. Woolley & Associates, Inc.
2832 Walnut Avenue, Suite A, Tustin, California 92780
714-734-8462
dave@dwoolley.com

| | |
|---|---|
| 20+ Years of Experience | **PROFESSIONAL LICENSES** |

- California License: PLS 7304
- Nevada License: PLS 13299

## AFFILIATIONS

- California Land Surveyors Association (CLSA) - Orange County Chapter Legislative Chairman 1999 - Current
- CLSA - Chapter Representative for the State
- CLSA State Legislative and Professional Practices Committee Member
- CLSA Professional Development Program Member 2010-11
- Land Surveyors Advisory Council on Technical Standards  (LSACTS) – Vice Chair
- American Congress of Surveying and Mapping Member
- Orange County Financial Crimes Investigators Association Member
- American Bar Association Associate
- Affiliate of LA and OC County Bar Association
- California Receivers Forum – Los Angeles / Orange County Chapter Member
- Association of Certified Fraud Examiners – Associate Member

> Expert in 40+ court cases involving land surveying issues

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| President / Owner: | D. Woolley & Associates, Tustin, CA, 2003 to Present |
| Vice President: | Johnson-Frank & Associates, Anaheim, CA, 1998-2003 |
| Chief of Parties: | Huitt-Zollars, Irvine, CA, 1997-1998 |
| Surveyor's Office: | County of Orange, Santa Ana, CA, 1988-1997 |

## NOTABLE ACCOMPLISHMENTS

> D. Woolley & Associates, Inc. files more Records of Survey than 3 largest firms in Orange County and Caltrans combined.

### *Complex Boundary and Title Review Issues*

A cornerstone for D. Woolley and Associates is the ability to resolve complex boundary and title review issues and to provide surveys for people involved in litigation.  Acting extensively as an expert witness and consulting experts in various cases, D. Woolley & Associates assist attorneys in understanding and analyzing real property boundary and land title issues, fraud, standard of care, and professional negligence issues.

### *Reviewed Over 1000 Tract Maps, 500 Parcel Maps and 300 Record of Surveys*

Mr. Woolley was the former supervisor of the Record of Survey, Parcel Map and Tract Map submittals section of the Orange County Surveyor's office. He was responsible for compliance with state laws, local ordinances and boundary determination. In addition to the preparation of Records of Survey, he reviewed over 1000 Tract Maps, 500 Parcel Maps and 300 Records of Survey prepared by  Professional Land Surveyors.

| Technical Expert for California Board of Professional Engineers and Land Surveyors |
|---|

*Peer Consultant*
Mr. Woolley is recognized throughout California as a boundary and title expert. He is often asked to review and/or perform surveys for other Professional Land Surveyors (peer review), particularly when such projects may be subject to litigation.

## SPECIALIZED COMPETENCE

| ADR Specialist |
|---|

Expert in the following: Land Surveying; standard of care; construction surveying; boundary line determination and analysis; boundary disputes; deed interpretation; boundary reconstruction; easement analysis and construction; map preparation, The Professional Land Surveyor's Act and The Subdivision Map Act; ALTA surveys; documentation of construction defects; settlement/displacement surveys.

Mediation: Mr. Woolley has sought additional education and certification from UC Irvine. He saw the value in mediating (alternative dispute resolution or ADR) between conflicting parties. This allows the most knowledgeable boundary person, the surveyor, to assist the parties in boundary resolution without costly litigation. This experience and education is valuable for the client as well as the attorneys.

## SELECTED PUBLICATIONS

The California Surveyor – Ongoing
Mr. Woolley writes a quarterly article "The More Things Change, The More They Stay The Same", a historical retrospective to today's changes in the profession.

The California Surveyor - 2009
*"The Professional Practices Committee: Surveyor's Friend or Foe?"*

| Author of 3 Surveying Articles (Two made the cover) |
|---|



The California Surveyor - 1999
*"The Wall of Fire"*



The California Surveyor – 2005
*"A Working Man's Guide to Laser Scanning"*

## SELECTED WHITE PAPERS

Author of the White Paper series
on Land Surveyor Liability

Published under Land Surveyors Advisory Council on Technical Standards (LSACTS)

- Land Surveyor Liability (Party 1 of 9) - May, 2010
- Land Surveyor Liability (Part 8 of 9), A Land Surveyor's Guide to Defamation and Free Speech - August, 2010
- Ground Leases/Leasehold Estates and the Surveyor - December, 2010
- Land Surveyor Liability (Part 2 of 9), The Land Surveyor As An Expert Witness In Litigation - Procedures, Techniques, and Liabilities - January, 2011

## OTHER WHITE PAPERS

- MERS: The Unreported Effects of Lost Chain of Title on Real Property Owners - January, 2011

## BACKGROUND AND HONORS

Geophysical Surveying Curriculum
    National College, Rapid City, South Dakota
Land Surveying Curriculum
    Santa Ana Community College, Santa Ana, California
Legislative Chairman California Land Surveyor's Association
    Orange County Chapter 1999-Present
Authored Assembly Bill 557 (AB 557) 1993
    Modifying the Subdivision Map Act
Consultant to Professional Land Surveyors (Peer to Peer)
    On boundary, mapping , title, and survey analysis
CLSA Professional Development Program
    One of 25 Land Surveyors to have completed the program 2010-11

Established and instructs "Ethics, Standard of Care, and the California Business and Professions Code" for the Land Surveying Program at Rancho Santiago Community College

## CLASS INSTRUCTOR FOR:

Engineering 118 and 119
    18 week course, Rancho Santiago Community College, Santa Ana, California, 1991 - 1996
Ethics, Standards of Care and the Business & Professions Code for the California Land Surveyor
    8 week course, Rancho Santiago Community College, Santa Ana, California, 2009 - Present

## EXPERT TESTIMONY

The 40+ land surveying cases that Mr. Woolley was retained for involved:

- Encroachments
- Trespass
- Landslide
- Surveyor negligence and standard of care
- Q&A for depositions
- Preparation for deposition

- Review of deposition transcripts
- Writing technical reports
- Technical review of settlement documents
- Preparing declarations
- Exhibits
- Trial preparation

3

# EXPERIENCE HIGHLIGHTS

<div style="border:1px solid black; padding:8px; width:200px;">Pro Bono Services</div>

## Pro Bono Services
D. Woolley & Associates, Inc., regularly performs pro-bono surveys for members of the public that may not be able to afford a property survey.

## California State Senator, Bob Margett:
Conducted a survey for constituent, Mr. Ewing Chow

# GUEST LECTURER

## Pepperdine University
In Fall 2010, Mr. Woolley was a guest speaker for "*Managing Within The Legal, Ethical and Governmental Environment*" at Pepperdine University Graziadio Graduate School of Business and Management.  He spoke about the history of the land title system and real property case history.

<div style="border:1px solid black; padding:8px; width:200px;">Community Service</div>

## American Congress of Surveying Mapping

- *"ACSM/NSPS ALTA Standards and How They Relate to Section 8762 of the Professional Land Surveyor's Act."*
  Dave Woolley, PLS 2007

Mr. Woolley has conducted seminars for the American Congress of Surveying Mapping on California survey law & standard of care for land surveyors. These seminars were well attended by fellow professionals.

## California State University Fresno

<div style="border:1px solid black; padding:8px; width:200px;">All fees associated with lectures have been donated.</div>

- *"Professional Land Surveyor's Act and the Record of Survey Process"*
  Dave Woolley, PLS, 2007
- *"Standards of Care Revisited Part 1"*
  Paul Cuomo, PLS and Dave Woolley, PLS, 2008
- *"Standards of Care Revisited Part 2"*
  Paul Cuomo, PLS and Dave Woolley, PLS, 2008

Mr. Woolley has been an invited guest speaker for California State University Fresno in 2007 and 2008, he has lectured on the surveyor's code of conduct, standard of care, the procedures the Board of Professional Engineers and Land Surveyors utilize with enforcement cases.

## California Land Surveyor's Associations
Mr. Woolley has been the guest speaker for the California Land Surveyor's Associations for the counties of Orange, Los Angeles, Riverside, Desert Chapter (Palm Springs), San Bernardino, and San Diego.  "ALTA/ACSM Standards and How They Relate to Business & Professions Section 8762."

## California Land Surveyor's Associations – Northern Counties Chapter
Mr. Woolley was a guest speaker for the CLSA Northern Counties Chapter Conference, "Records of Survey and the Business & Professions Code for the California Surveyor."

## Rancho Santiago Community College (2009 – Present)
Mr. Woolley teaches "Ethics, Standards of Care and the Business & Professions Code for the California Land Surveyor" at Rancho Santiago Community College.

4

> **Mr. Woolley Has Testified in Depositions and Court for Civil And Criminal Proceedings.**

<u>Land Surveyor Prep Class (2007 – 2010)</u>
Mr. Woolley has taught a 14 to 18 week class at his office for sub-professionals, to prepare to them for California PLS exams.

<u>Orange County Council – Boy Scouts of America (Costa Mesa, CA)</u>
Mr. Woolley assisted Troop 90 in receiving their Surveying Merit Badge in January, 2010.

<u>Professional Land Surveyors of Oregon (PLSO)</u>
Mr. Woolley spoke at the 2011 PLSO Conference in Salem, Oregon.  The 6 hour engagement included land surveyor liability, standard of care, and ethics.  His presentation also included case law review and the role of an expert witness.

All fees associated with lectures have been donated to the various groups/organizations and memorials.

# EXHIBIT J

## DEFINITIONS

A.   **"Chain of title"** is a "record of successive conveyances, or other forms of alienation, affecting a particular parcel of land, arranged consecutively, form the government or original source of title down to the present owner."[1]

B.   A **"deed"** is a "conveyance of realty; a writing signed by grantor, whereby title to realty is transferred from one to another."[2]

C.   A **"wild deed"** is "a deed not in the chain of title.  An instrument which is recorded but, because some previous instrument connecting it to the chain of title has not been recorded, will never be discovered in the indexes."[3]   Documents that are improperly indexed or otherwise have a defect that prevents them from being discoverable in the chain of title by searching the grantor/grantee index do not impart constructive notice to subsequent parties and are considered wild deeds.[4]

D.   **"Race/notice statutes"** and **"race recording statutes"** refer to states with race recording statutes.   The party who records an instrument of conveyance has the better claim regardless of notice of prior unrecorded instruments. [5]

E.   **"Sequential conveyances"** are parcels of land created from a parent parcel by a common grantor.   **"Senior rights"** are determined by examining the deeds of all the parcels created from the parent parcel with respect to the date that they were initially executed, the earliest (senior), the latter (**"junior rights"**) getting what is left. [6]

---

[1]   Black's Law Dictionary (6th ed. 1990), pg. 229.  See also Brown, Robillard and Wilson, *Evidence and Procedures For Boundary Location* (2nd ed. 1981), pg. 320, § 12-6 stating "A person guaranteeing title must, of necessity, examine all transfers back to the creation of the title."

[2]   Black's Law Dictionary (6th ed. 1990) pg. 414

[3]   Black's Law Dictionary (6th ed. 1990) pg. 415.

[4]   California Education of the Bar, *California Title Insurance Practice* (2006) §4.23, pg. 80.

[5]   Black's Law Dictionary (6th ed. 1990), pg. 1258.  For purposes of this paper, we are not distinguishing between, race, notice, race/notice and race recording.  Race/notice is meant to encompass all designations.

[6]   Paul A. Cuomo, LS, *The Quasi-judicial Functions of the Land Surveyor, Part 2:  Senior Rights: Here Today, Gone Tomorrow*, The American Surveyor (2006).

# EXHIBIT K

**ORDER NO. :** 2607088597-56

The land referred to is situated in the County of Orange, City of Orange, State of California, and is described as follows:

Lot 86 of Tract No 2642, in the City of Orange, County of Los Angeles, State of California, as shown on a map thereof recorded in Book 83, Pages 26 and 27 of Miscellaneous Maps, in the Office of the County Recorder of said County.

Grantor covenants that it is seized and possessed of the said land and has a right to convey it, and warrants the title against lawful claims of all persons claiming, by, through and under it, but not further otherwise.

The following reservations from and exceptions to this conveyance and the warranty of title made herein shall apply.

(1) All easements, rights-of-way and prescriptive rights whether of record or not, pertaining to any portion(s) of the herein described property (hereinafter, the "Property");

(2) All valid oil, gas and mineral rights, interests or leases, royalty reservations, mineral interest and transfers of interest of any character, in the oil, gas or minerals of record in any county in which any portion of the Property is located;

(3) All restrictive covenants, terms, conditions, contracts, provisions, zoning ordinances and other items of record in any county in which any portion of the Property is located, pertaining to any portion(s) of the Property, but only to the extent that same are still in effect;

(4) All presently recorded instruments (other than liens and conveyances by, through or under the Grantor) that affect the Property and any portion(s) thereof;

(5) Ad valorem taxes, fees and assessments, if any, for the current year and all prior and subsequent years, the payment of which Grantee assumes (at the time of transfer of title), and all subsequent assessments for this and all prior years due to change(s) in land usage (including, but not limited to, the presence or absence of improvements, if any, on the Property), ownership, or both, the payment of which Grantee assumes; and

(6) Any conditions that would be revealed by a physical inspection and survey of the Property.

